THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
JOHN R. MILLER, Defendant-Appellee.

Fourth District   No. 4—92—0587

Opinion filed February 18, 1993.

Charles G. Reynard, State's Attorney, of Bloomington (Norbert J. Goet-
ten, Robert J. Biderman, Linda Susan McClain, and Penelope Gainer, all of
State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Adam Bourgeois, of Chicago (Rex L. Reu, of counsel), for appellee.

JUSTICE KNECHT delivered the opinion of the court:

On February 1, 1991, defendant John Miller was driving on Inter-
state 55 (hereinafter I-55) in McLean County, Illinois. He was stopped
by Illinois State trooper Jeff Gaither for an alleged loud muffler. Af-
ter an alleged consensual search of defendant's vehicle, 44 pounds of

cannabis were confiscated and defendant was charged by indictment with cannabis trafficking and unlawful possession of cannabis with intent to deliver. Ill. Rev. Stat. 1991, ch. 56½, pars. 705.1, 705(e).

After a hearing in February 1992, the trial judge denied defendant's motion to suppress the cannabis seized and statements he made after the cannabis was discovered. In June 1992, the trial judge granted defendant's motion to reconsider his ruling and then suppressed the evidence. The State appeals. We affirm the trial judge's suppression order.

## I. FACTS

### A. Initial Suppression Hearing

In May 1991 defendant filed a motion to suppress alleging (1) the stop for a minor traffic violation was pretextual; (2) the search was improperly made without a warrant or consent; (3) the scope of the search was unreasonable; and (4) the officers lacked probable cause to believe the vehicle contained contraband or that defendant had committed or was committing any criminal or motor vehicle offense.

At the suppression hearing, Illinois State Trooper Gaither, a member of the force for over five years, and Trooper Brenden Heffner, a member of the force for three years and a law enforcement officer for an additional four years, testified about why defendant's vehicle was stopped on February 1.

According to their testimony, they were in their respective police vehicles at a crossover on I-55 just north of the Funk's Grove rest stop near milepost 150. They were sitting with their windows down, driver's window to driver's window, talking and monitoring traffic. Each heard a vehicle approaching with a very loud exhaust.

Gaither testified that when he entered the highway he also noticed defendant's 1975 brown Ranchero vehicle had Texas plates, the plates had expired in January 1991, and a trailer ball hitch made it difficult to read defendant's entire license plate. The State entered uncontested photographs identifying these characteristics of defendant's vehicle.

Gaither indicated he stopped defendant's vehicle because of three vehicle code violations: (1) the loud exhaust which initially drew attention; (2) the expired license plate; and (3) the trailer ball hitch, which somewhat obstructed the numbers on the license plate. Defendant's vehicle was stopped at approximately 9:40 a.m.

While at defendant's vehicle, Gaither asked him for his driver's license and paperwork on the vehicle. According to Gaither, defendant

mentioned he had flown from Fort Lauderdale to Texas. Defendant accompanied Gaither to his squad car. While they were seated in Gaither's vehicle, Gaither called in and received verification of defendant's identity provided on his license and vehicle registration. There were no warrants reported for defendant.

Gaither spoke with defendant for a few moments in the squad car before Heffner arrived. According to Heffner, he had remained in the crossover for a short while before travelling to Gaither's location to see if he needed assistance. Heffner sat in the rear seat of Gaither's vehicle, directly behind defendant. Gaither testified he thought Heffner was in the vehicle while defendant again spoke about travelling from Fort Lauderdale to Texas by air.

Heffner testified the circumstances of the stop were not initially such that drug activity was suspected. After Gaither spoke with defendant about where defendant came from and noted from defendant's license he resided in Florida and from the vehicle registration that it came from Texas, however, Gaither called for a canine unit. He was told it would not be available for an hour. Heffner and defendant were in the vehicle when Gaither requested the unit.

According to Gaither, several things aroused his suspicions and caused him to call for the canine unit: (1) defendant appeared nervous; his voice raised and lowered in octaves and cracked, and his hands were shaking; (2) defendant gazed out the window when Gaither tried speaking with him; (3) Gaither found defendant's story— that he had flown from Fort Lauderdale to Texas to buy a vehicle for $1,000 and to take it to Chicago for his father—unusual; (4) the vehicle was coming from a drug source area, as Loredo is a border town from which narcotics originate, and Chicago is an area to which narcotics travel; and (5) the vehicle had just been purchased within the last couple of days, consistent with other narcotic busts.

Gaither issued defendant a warning ticket for the loud muffler and defendant reportedly told him for the third or fourth time that he would get the muffler fixed when he arrived in Chicago. Gaither testified he gave defendant a break by not issuing a warning for the expired license plate because defendant had the paperwork to show he recently purchased the vehicle. After he returned defendant's paperwork and driver's license to him and explained the warning to him, Gaither told defendant he was free to go.

As defendant began exiting the vehicle, Gaither told him the State of Illinois has a large problem with people bringing up guns and drugs from the Texas valley area. Defendant then stated " 'I don't have any guns,' " or " 'I don't have a gun. If you'd like to look ***,

feel free.' " Gaither responded, " 'You don't mind if I search the vehicle?' " Defendant again reportedly told Gaither to search if he wished.

According to Gaither, this initial consent by defendant would have permitted the officers to search his entire vehicle, including the taillights. Because it was cold, Gaither offered defendant the option of observing the search of his vehicle or waiting in the squad car. Defendant chose the latter option.

According to Heffner, who remained in the vehicle with defendant, defendant told him he had flown from Fort Lauderdale, Florida, to Austin, Texas, and was en route with the vehicle to Berwyn, Illinois, where he was going to deliver the vehicle to his father.

While Heffner remained with defendant, Gaither searched the interior of his vehicle, looking under the seats and in the glove compartment. He smelled a strong odor of cannabis in the vehicle but found none. He investigated around the outside of the vehicle and laid the tailgate down. He observed some screws were missing along the inner area of the tailgate and a corner screw was quite loose. Gaither lifted it up and with a flashlight he looked inside where the Ford emblem went across the tailgate. The screw ends which protruded into the interior of the tailgate were covered with duct tape.

When Gaither approached the rear of defendant's vehicle, defendant exited the squad car to observe the rest of the search. Defendant, Heffner, and State Trooper William Colbrook approached the rear of the vehicle. Gaither told Heffner he detected the smell of cannabis. After investigating the smell within defendant's vehicle, Heffner too, stated he smelled cannabis. Defendant asked Gaither what he smelled. Gaither told him cannabis. Defendant responded the vehicle was from Texas and could have previously been used for transporting cannabis.

Gaither again radioed for the canine unit and was told it could arrive in approximately 15 minutes. He asked defendant if he would mind waiting and defendant said he would wait. While they spoke, Gaither noticed the left taillight cover had three new shiny screws and three rusty toolmarked screws holding it in. The right taillight cover had five shiny screws and one rusty screw holding it in. Gaither shared this observation with defendant and asked him if they could take the taillight cover off to look inside the compartment while they waited for the canine unit. Defendant said it would be all right but he had no screwdriver. Gaither retrieved a screwdriver from his squad car.

When he returned with the screwdriver, Gaither testified he again asked defendant if removing the taillight cover was acceptable to him. Defendant responded it would be fine. Gaither removed the left tail-

light cover and the quarter panel behind it was filled with plastic bags of cannabis. Defendant was placed under arrest. According to Gaither, there were 22 pounds of cannabis in the rear quarter panel on each side of the truck, totalling 44 pounds.

In response to questioning by defense counsel, Heffner stated rather than being at the crossover with Gaither on the day in question he may have been making a stop on southbound I-55 at milepost 160 at 9:26 a.m. He did not recall exactly what he was doing at that time. He could have issued a ticket at 9:30 a.m. and testified if the information on the case stated he cleared from that traffic stop at 9:34 a.m. that was correct.

Defendant testified he lived in Fort Lauderdale, Florida. The day he was stopped there was nothing wrong with the exhaust on his vehicle. According to defendant, Gaither followed him for a short while before stopping him. Gaither told him he stopped him because of his loud muffler. Defendant started the vehicle again and Gaither then observed the muffler no longer sounded loud. Defendant testified he gave Gaither his driver's license, the bill of sale and the registration to the vehicle. Defendant followed Gaither to his squad car.

Gaither began talking about the vehicle, how it was loud, checking his license, and inquiring about where defendant resided. Gaither made a radio transmission regarding defendant's license. He inquired where defendant purchased the vehicle and where he was en route to. While they talked, Gaither was writing a warning ticket. According to defendant, he never received the warning ticket or his driver's license back until they got to the police station.

Defendant heard a second radio transmission regarding a canine unit and the response that it would be an hour and 15 minutes for the unit to arrive. According to defendant, he told Gaither he had an appointment at noon which he had to make. He told the officers he was meeting his father in Berwyn. Gaither responded, " 'Well, we have trouble with drugs and guns from Florida.' " Defendant responded, " 'Well, I don't have any of those.' "

Gaither asked defendant to consent to a search of his vehicle, to which defendant again responded he was in a hurry to make his appointment in Chicago. Defendant told Gaither he could not search his vehicle. At that time, Heffner was sitting behind him in the squad car. Gaither stated, " 'Well, it's a policy that we check out cars from Florida and Texas.' " Gaither exited the car while Heffner spoke with defendant.

According to defendant, he stayed in the vehicle because he assumed Gaither was going to search his vehicle anyway. Gaither did

not present an option to him that he observe the search or remain in the vehicle. Gaither looked in the front of the vehicle, went to the rear of the vehicle and pulled down the tailgate. He looked at it and then started ripping up the panel of the tailgate. Defendant got out of the squad car and said, " 'I don't want you to rip up part of my car.' " Gaither replied, " 'Well, it looks like it's been hauling drugs,' " to which defendant replied, " 'I don't know anything about that.' "

Gaither radioed a second time to request the canine unit. Defendant told Gaither again that he was in a hurry and had to leave to make his appointment in Chicago. When Gaither asked defendant again if he could wait, defendant responded he could not. Defendant testified Gaither returned to the squad car, said something to Heffner about the screws, retrieved a screwdriver, returned to defendant's vehicle and began opening up the back of the vehicle.

Defendant was never asked to sign a consent form to permit the search of his vehicle. On cross-examination, defendant denied he told the officers a number of times he would get the muffler repaired when he arrived in Chicago.

Gaither testified in rebuttal. He did not remember defendant restarting the vehicle after it was stopped. Nor did he recall any conversation about the sound of the exhaust system after he stopped defendant's vehicle. According to Gaither, at defendant's vehicle he only told defendant he had been stopped for a loud muffler. While they sat in Gaither's squad car, defendant told him he would repair the exhaust system when he arrived in Chicago, the vehicle had not been modified, and that the exhaust system was normally that loud.

Gaither also testified defendant never said anything about having an appointment in Chicago. Defendant only said he was going to Chicago to visit his father and to give him the Ranchero. Gaither also testified defendant did not indicate he did not want the vehicle searched. Gaither denied he told defendant the department had a policy to check Florida and Texas vehicles. He also testified the department had no such policy.

At no time while Gaither was investigating the tailgate did defendant tell him he did not want Gaither to do so. Nor did defendant tell him not to rip up the tailgate or look inside it. Defendant also did not at that point state he was in a hurry to leave. According to Gaither, Heffner arrived before or shortly after Gaither radioed to check defendant's driver's license record and vehicle registration.

Heffner testified in rebuttal that when he entered Gaither's squad car, Gaither and defendant were discussing the loud muffler. Defendant stated although the muffler was loud, it was that way when he

got the vehicle and he would get it repaired as soon as possible. Heffner never heard defendant mention having an appointment in Chicago. Heffner never heard defendant tell Gaither he was in a hurry because he had to meet someone at noon in Chicago. Heffner did not recall Gaither saying anything to defendant about his policy of checking vehicles from Florida and Texas. At no time while Heffner and defendant remained in Gaither's squad car did defendant say he was in a hurry or wished to leave. Defendant had not indicated he did not want the search to continue and did not protest the search.

Colbrook, a State trooper for five years, testified that when he arrived he stood at the right rear bumper of Gaither's squad car, which contained defendant, Gaither, and Heffner. After Gaither began searching defendant's vehicle, he came back and told Colbrook he could smell cannabis in the passenger compartment of defendant's vehicle. Colbrook went to the driver's side door and smelled the odor of cannabis in the passenger compartment. Colbrook testified that when defendant was asked, he said he did not mind waiting for the canine unit.

Colbrook testified he and Gaither asked defendant if they could remove the taillights. Defendant responded he did not have a screwdriver. Gaither replied he had a screwdriver and he retrieved it from his squad car. He again asked defendant if he could remove the taillights. Defendant approved. Colbrook never heard defendant say anything about an appointment in Chicago, that he was in a hurry to leave, nor did defendant ask that the search cease and he be allowed to leave.

After considering the testimony, the trial judge denied defendant's motion to suppress the evidence. The judge outlined the following findings of facts and law:

"2. During the mid-morning hours of February 1, 1991, the Defendant was operating a 1975 Ford Ranchero vehicle northbound on Interstate Route 55 in McLean County when he was observed by the arresting officer and another officer, who were in their respective squad cars, as he passed them.

3. Initial attention to the vehicle was drawn because of a 'loud' muffler and the arresting officer proceeded to make a traffic stop during which he noted the vehicle also had Texas license plates which had expired.

4. The arresting officer initially had probable cause to stop the Defendant for a traffic violation, operating a motor vehicle with a loud muffler; identify the operator and the ownership

and registration of the vehicle; and thereafter issue the warning ticket for the loud muffler.

5. That the officer also had suspicions as to the possible transportation of drugs does not invalidate the traffic stop made where no search was made in the absence of the valid consent of the Defendant.

6. While the arresting officer hoped to induce the Defendant to consent to a search of his vehicle, the Defendant was not in custody, all documents had been returned to him, and he was free to depart at the time the consent was given.

7. The consent given was not coerced and the Court finds the Defendant affirmatively agreed to a 'search' of the vehicle.

8. The search by the officers did not exceed the consent given."

### B. *Hearing on Motion to Reconsider*

In June 1992, a hearing was held on defendant's motion to reconsider and vacate the trial judge's previous denial of defendant's motion to suppress. Defendant's evidence and argument at this hearing were that Officers Gaither and Heffner were untruthful in the initial hearing.

Michael Linskey, supervisor of radio communications for the Illinois State Police, described the procedures for handling incoming radio traffic between the office and the officers in the field. A logging machine records incoming radio traffic on a 24-hour tape. The machine displays the time each transmission is made. This system was functioning properly on February 1, 1991, the day defendant was stopped and later arrested.

A telecommunicator also uses a separate computer to record the location of the officer and his activity code at the time the officer makes radio transmissions. The computer automatically records the time of each transmission. All records are made simultaneously with the transmission and any backdated entry of the records would be shown by an asterisk. Each recording is kept for a month and then is recorded over. The records are called activity notes and inquiry transaction reports.

Linsky testified "activity code 102Y" means the patrol code for the interstate. "Activity code 106" means a traffic stop where the officer gives his location and car information. The "activity code 106" initiates a five-minute waiting period. If the officer does not call back or respond to a status check in five minutes, the radio transmission in Pontiac, Illinois, will send backup to the location indicated by the offi-

cer's initial transmission. If the officer responds within the five-minute window and reports he is secure, no backup is sent. "Activity code 106A" means a traffic stop in progress, no need to send backup. "Activity code 102Y" means a cleared traffic stop and the officer is back on patrol. "Activity code 837Y" means a drug investigation.

The defense submitted as evidence the computer records of Gaither's and Heffner's activities on February 1, 1991, the day defendant was arrested. Gaither's report indicates at 9:34 a.m. on February 1 he made a radio transmission with a 106 activity code, representing a traffic stop. The stop was made on I-55, at northbound milepost 152 on a brown Ford Ranchero with Texas license plate number 789IGJ. The next entry was at 9:36 a.m. and shows Gaither made an inquiry on a name. A second request at 9:36 a.m. was also an inquiry on a name. At 9:39 a.m. there was a 106A code entered, meaning Gaither had made his stop and had determined he was secure and did not need assistance; the transmission location again indicated Gaither was located on I-55, northbound milepost 152 with a brown Ford Ranchero. The record indicates all entries were made simultaneously with Gaither's transmission.

The activity notes show Gaither requested a canine unit to come to his location at 9:41 a.m. The report shows at 10:12 a.m. Gaither stated we have already found it, tell the canine unit to disregard, and Gaither requested a tow.

Heffner's activity notes and transaction report for February 1 indicate that at 9:26 a.m. he was making a traffic stop on I-55, at southbound milepost 158 on a white Ford, license number VB4674. The next entry shows an inquiry on a name at 9:29 a.m.; the record indicates the input was simultaneous with Heffner's transmission. The next entry at 9:31 a.m. indicated Heffner had cleared his traffic stop to show he was secure and did not need assistance; Heffner again indicated he was on I-55, at southbound milepost 158 with the white Ford. The next entry was at 9:35 a.m., indicating he was back on patrol on the interstate. At 10:17 a.m., Heffner made a radio transmission with the code 837Y, and at 10:23, he indicated a code 102Y and that he was on I-55, northbound at milepost 152 (where defendant was stopped). There were no back entries on Heffner's report with the exception of the last entry of the day.

The parties stipulated to the testimony of Glen Jaukkuri, the subject of Heffner's traffic stop on February 1. Jaukkuri would have testified he was stopped by an Illinois State trooper and that the duration of the stop was approximately 10 minutes from start to finish.

The defense also submitted into evidence a cassette copy of the master tape for February 1, which was the recording of the radio transmissions between 9:32 and 10:17 by Gaither and Heffner to Pontiac. The tape was played for the court.

Linskey testified there is no way to determine whether an event is actually occurring simultaneously with an officer's transmission. He agreed occasionally the communication system did not work properly and it is difficult to hear transmissions communicated to and from south McLean County. According to Linskey, difficulties with transmissions are fairly common from south of Bloomington, Illinois. An officer sometimes retransmits or follows up a transmission. Normally there is no notation of any transmission difficulties. If there was some discrepancy, it would be up to the officer if he wanted to note something had happened at an earlier time.

If an officer made a traffic stop (106), but had difficulty with the radio, if he clears from the stop he would transmit the activity code 102Y. He would have no reason to transmit a 106A. However, if an officer called out a 106A if he was no longer on the stop, communications would have no way to know one way or another.

Gaither and Heffner again testified they were together at the crossover at milepost 150 before defendant was stopped. Heffner testified he had no specific recollection of what he was doing earlier that morning. He left the crossover to assist Gaither one to two minutes after Gaither left.

Both testified Heffner was present when Gaither made the inquiry about defendant's name to check the status of his license. The notation of 9:40 on defendant's written warning represents the time Gaither wrote the warning.

Officers Gaither, Heffner, Colbrook and Sergeant McConkey all testified radio communications to and from Pontiac along the southern portion of McLean County on I-55 are often difficult. As a result, transmissions must sometimes be made several times before they are acknowledged.

Gaither and Heffner testified they do not inform Pontiac routinely if it is a repeat call. Gaither testified it is fairly common for him to call in a code 106 after he has actually been on a code 106 for a period of time. He did not remember whether he had to repeat his transmissions about defendant's stop. He also testified he inquires about the license plates and waits for the response before he turns on his red lights. He again testified the trailer ball hitch was blocking the defendant's rear license plate as he followed defendant on February 1.

Heffner testified the notation of 9:25 on Glen Jaukkuri's written warning represents the time he was filling out the warning. He admitted that by the time he fills in the time on a warning ticket he has been on the traffic stop for awhile because he will have already made the traffic stop, talked to the driver, decided to issue a warning ticket, and begun to fill out the form.

Heffner testified that while he made an inquiry on a name at 9:29 a.m., when he issues a written warning he does not wait until he receives the information from an inquiry before he begins filling out the warning. He did not remember if there were any transmission problems involved in the Jaukkuri stop. According to Heffner, the logs reflect approximate actions and times activities occurred during a day.

Colbrook testified he had been on the scene and standing by Gaither's squad car a few minutes when he heard radio transmissions by Gaither to Pontiac on his portable radio regarding a canine unit. He merely showed up at the scene. He had not been summoned or sent to the scene and did not assume the stop was anything but run of the mill.

McConkey, the supervisor of the drug interdiction team, testified the radio logs are a general record of activities which occur and many times so much traffic comes in over the airwaves that they cannot be accurate. There are also times when radio traffic is so heavy that one cannot get through. According to McConkey, when he looks at the radio logs, he does not automatically presume the indicated time of when an activity occurred is accurate because of the volume of air traffic resulting in inaccurate entries and the difficulties in radio traffic in the southern part of McLean County. McConkey also testified it would take no less than eight minutes to travel from milepost 158, where Heffner's logs indicate he inquired at 9:29 a.m. about a name of the person whose vehicle he had stopped at 9:26 a.m., to milepost 150, where defendant was allegedly initially observed by Gaither and Heffner and subsequently stopped by Gaither at 9:34 a.m. at milepost 152.

The court made the following factual findings:

"And it's very clear to me that with Trooper Heffner inquiring as to the name of the stop he had at 9:29 that that could not occur at a time after that. So we know it had to be in the framework parameters of the 9:29. He couldn't have occurred—when we look at 9:34 when Trooper Gaither is rolling, as he said, and giving an identification of getting a license check on the defendant's vehicle, again that could not have occurred before the 9:34 start time. With that kind of a framework there is

only the window of maybe six minutes, forgetting about whether somebody called in late on the 106A, called in late on the 9:34, called in early on the 9:34. We have a framework of time when these circumstances testified to by the officers just couldn't have occurred the way they said. The crossover—the court is of the opinion the officers are at the least mistaken as to this particular arrest occurring as a result of them sitting in the median cross-over talking to each other when the defendant went by, and I just find that not to be credible. Under the circumstances, since I find that not be credible, and I think there's a number of other things that support in the record here that have been presented which support the fact that the testimony is faulted and cannot stand, and the court's going to grant the motion to reconsider and vacate the order of denying suppression, and I will grant the suppression."

The court's written order indicated it found the testimony of the officers was not credible regarding the circumstances of the stop. Therefore, it was rejecting the balance of the evidence, finding probable cause for the stop did not exist and the search incident to the stop was improper.

## II. ANALYSIS

The State initially argues we must reverse the trial judge's ruling because in granting the motion the trial judge concluded the officers lacked probable cause to stop defendant's vehicle. Probable cause is not the proper standard. Rather, the State correctly notes the officer's stop of defendant's vehicle was proper if the evidence met the less demanding test of whether the officers had a reasonable articulable suspicion the driver was unlicensed, the vehicle was not registered, or the vehicle or the driver is otherwise subject to arrest for violation of a law. *Delaware v. Prouse* (1979), 440 U.S. 648, 663, 59 L. Ed. 2d 660, 673, 99 S. Ct. 1391, 1401.

A trial judge's ruling on a motion to suppress will not be disturbed unless it is against the manifest weight of the evidence. (*People v. Brown* (1990), 136 Ill. 2d 116, 125, 554 N.E.2d 216, 220; *People v. Neal* (1985), 109 Ill. 2d 216, 218, 486 N.E.2d 898, 899; *People v. Gorman* (1991), 207 Ill. App. 3d 461, 468, 565 N.E.2d 1349, 1353.) The officer's conduct should be evaluated objectively, looking to whether the facts available to him warrant a person of reasonable caution to believe the officer's action was appropriate. *People v. Sorrells* (1991), 209 Ill. App. 3d 1064, 1069, 568 N.E.2d 497, 500.

The State argues the trial judge erred by granting defendant's motion to suppress because, even if the evidence at the reconsideration hearing were viewed as showing Gaither and Heffner *could not* have been present together to hear defendant's loud muffler, the evidence established alternative reasons for Gaither to stop defendant's vehicle. The alleged additional reasons were that the license plate on defendant's vehicle was expired and it was partially obstructed by a trailer ball hitch.

Under some circumstances, each added reason could warrant stopping a vehicle. Information indicating the registration of a particular vehicle may be expired or invalid or a traffic violation has occurred authorizes an officer to stop the vehicle. (*People v. Houldridge* (1983), 117 Ill. App. 3d 1059, 1062, 454 N.E.2d 769, 772; *Sorrells*, 209 Ill. App. 3d at 1069, 568 N.E.2d at 500.) Sections 3—413(b) and (f) of the Illinois Vehicle Code require the registration plate of a vehicle to be clearly visible and the registration sticker to be current. Ill. Rev. Stat. 1991, ch. 95½, pars. 3—413(b), (f).

In this case, the evidence may have led the trial judge to conclude Gaither was authorized to stop defendant's vehicle. Gaither testified that when he pulled onto the highway to stop defendant's vehicle due to the loud muffler, he noted the license plate on the vehicle was partially obstructed and the registration sticker was expired. The State also admitted photographs into evidence which indicated these violations. Either violation could have provided ample reason for Gaither to stop defendant's vehicle and issue a ticket.

Moreover, the fact Gaither only issued a warning to defendant for the loud muffler and not for the added violations does not defeat the reasonable basis for stopping defendant's vehicle. An officer need not charge the person with the offense for which the person was originally stopped, and may decide not to charge a defendant with a minor violation after a more serious one is discovered. *Sorrells*, 209 Ill. App. 3d at 1069, 568 N.E.2d at 500.

The State directs us to cases where courts of review have reversed suppression orders. However, none of the cases cited address circumstances where a trial judge concluded the officer's testimony was either in error or not credible. *People v. Lillig* (1988), 174 Ill. App. 3d 647, 648-49, 529 N.E.2d 256, 257 (suppression improper where defendant conceded he committed a traffic violation); *People v. Perry* (1990), 204 Ill. App. 3d 782, 786, 562 N.E.2d 618, 621 (suppression improper where vehicle lacked rear license plate); *People v. Guerrieri* (1990), 194 Ill. App. 3d 497, 502, 551 N.E.2d 767, 770 (judgment

affirmed where defendant committed a traffic violation and had an obscured and possibly unsafe windshield).

The trial judge's ruling in this case was based on his conclusion that the officers' testimony was, at best, incorrect and, at worst, not credible. The cases relied on by the State do not involve similar factual discrepancies in the officers' testimony. The trial judge concluded the officers' testimony was suspect because of their persistence in claiming they were *together* on the crossover when defendant's vehicle passed with a loud muffler, which initiated Gaither's pursuit of defendant. The evidence at the reconsideration hearing undermined the officers' claim that Heffner was also present at the crossover. He was issuing a ticket to a different motorist approximately eight miles from where defendant was allegedly observed by Gaither and Heffner. The trial judge also noted at the hearing that there were additional suspect facts which led to his conclusion.

Although Heffner testified he remembered the positions of his and Gaither's vehicles in the crossover when they heard defendant's loud vehicle, Heffner could not recall anything about his earlier stop of a motorist eight miles from defendant's stop. Gaither, Heffner, and Colbrook each testified to remembering defendant consent to the search a number of times.

A trial judge's evaluation of the weight and credibility of witnesses should not be substituted on appeal. (*Sorrells*, 209 Ill. App. 3d at 1070, 568 N.E.2d at 500.) Based on the evidence presented at the reconsideration hearing, it was within the province of the trial judge to conclude the loud muffler could not have been the reason defendant's vehicle was stopped.

The State indicates the evidence that Gaither noted the expired license and that the license was partially obstructed warranted Gaither's stop of defendant's vehicle due to these violations. However, it was reasonable for the trial judge to conclude these observations were not made until *after* defendant was stopped for the alleged loud muffler. When the evidence established the stop was not made as described by the officers, the trial judge could reasonably have decided to give all the officers' testimony less credence. The trial judge's conclusion the testimony did not establish Trooper Gaither's initial stop of defendant was warranted was not against the manifest weight of the evidence.

Because we conclude the trial judge's ruling suppressing the evidence found in defendant's vehicle and his statements made after his arrest was proper, we need not discuss whether defendant consented to the search of his vehicle after he was stopped.

III. Conclusion

Gaither's and Heffner's persistent testimony they were both present in the crossover when defendant's loud muffler was heard was seriously undermined at the reconsideration hearing. The trial judge decided to disregard all of the officers' testimony regarding the stop of defendant's vehicle. No evidence remained to justify the stop of defendant's vehicle. Absent a lawful stop, defendant would not have been in a position to voluntarily consent to the search of his vehicle. Granting the suppression motion was not against the manifest weight of the evidence.

Affirmed.

McCULLOUGH and LUND, JJ., concur.