**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 16, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

EDUARDO ARCIGA-BUSTAMANTE
and ARGENIS VILLA-LOPEZ, a/k/a
Alfonso Nunez-Ramirez, a/k/a Rudy
Aguilar-Contreras,

      Defendants - Appellants.

No.04-7106 and No. 04-7129
(D.C. No. CR-04-7-WH)
(Eastern District of Oklahoma)

**ORDER AND JUDGMENT**[*]

Before **HENRY, HOLLOWAY** and **LUCERO**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist the determination of this

appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered

submitted without oral argument.

Co-defendants, Eduardo Arciga-Bustamante ("Arciga") and Argenis Villa-Lopez

("Villa-Lopez") were indicted for possession with intent to distribute methamphetamine,

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. This court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

in violation of 21 U.S.C. § 841(a)(1), and aiding and abetting, pursuant to 18 U.S.C. § 2. Following the denial of their motions to suppress critical evidence, Defendants entered conditional pleas of guilty and the district court entered orders sentencing Defendants to terms of imprisonment.

In separate appeals, Defendants contend that the district court erred in denying the motions to suppress. Villa-Lopez also contends that his sentence violates the Supreme Court's holding in *Blakely v. Washington*, 124 S.Ct. 2531 (2004), because the district court took into account his prior conduct, as well as his criminal history, before sentencing him to the lower end of the sentencing range.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm the district court with respect to the denial of suppression of the evidence. We, however, remand with respect to Villa-Lopez's sentencing.

## BACKGROUND

On December 11, 2003, Oklahoma Highway Patrol Trooper Cody Hyde (hereinafter Hyde) initiated a stop of a vehicle traveling eastbound on Interstate 40 after observing that the vehicle had a decorative border partially covering the rear tag of the vehicle and obstructing the letters of the state of issuance. The vehicle was driven by defendant, Argenis Villa-Lopez, with co-defendant, Arciga-Bustamante, riding as a passenger in the front seat. Hyde spoke to Villa-Lopez, asking that he accompany him back to the patrol car. Hyde advised Villa-Lopez that he was writing a warning for improper tag display. Hyde observed extreme, visible nervousness on the part of

Villa-Lopez, and Hyde's reassurance that no traffic citation would be issued did not allay the nervous condition of Villa-Lopez.

During the traffic stop, Hyde asked Villa-Lopez about his travel plans. Villa-Lopez informed him that he and Arciga were planning to visit his family in Little Rock, Arkansas, but was unable to provide an address of his relatives. Hyde likewise asked Villa-Lopez who his passenger was. Although Villa-Lopez stated the passenger was a friend he had known for three years, he could not provide the passenger's name. Hyde also learned that Villa-Lopez's driver's license had been issued in the State of Washington, although the car was tagged out of Oregon. Hyde further determined that Villa-Lopez had obtained insurance on the vehicle days before the departure which, in Hyde's experience, is not uncommon for drug couriers. At that time, Hyde believed he had probable cause to search the vehicle. However, rather than relying upon probable cause, Hyde got consent from Villa-Lopez to search the vehicle.

At the conclusion of the traffic stop, Hyde returned Villa-Lopez's documentation, provided the written warning, and advised Villa-Lopez that he was free to go. As Villa-Lopez opened the door to exit the patrol car, Hyde asked Villa-Lopez if he could ask another question. After receiving an affirmative response, Hyde asked Villa-Lopez if there were any weapons or drugs in the automobile, to which Villa-Lopez answered negatively. Hyde subsequently asked for and received consent to search the vehicle from Villa-Lopez.

After receiving consent, Hyde exited the patrol car and approached the vehicle.

-3-

He spoke to co-defendant Arciga, who was seated in the front seat on the passenger side of the vehicle. Arciga did not appear to speak English fluently, but did answer some questions which were propounded in English. Hyde asked him to exit the vehicle and placed him in the patrol unit.

Hyde returned to the stopped vehicle, opened the trunk, and found shoes, a small bag, and a gas can and funnel. In Hyde's experience, the gas can and funnel are often used by drug couriers because drugs may be stored in gas tanks, reducing the available quantity of fuel. Hyde ran his drug detection dog around and in the vehicle. The dog alerted to the back seat of the vehicle. Upon removing the seat, Hyde found a hidden panel in the area of the gasoline tank, accessible from the rear seat. At that time, Hyde removed the panel's covering and observed wrapped packages that proved to be methamphetamine. Defendants were placed under arrest and ultimately indicted for possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

In the district court, Defendants moved to suppress the evidence and contended that the traffic stop violated Fourth Amendment standards because the stop was based neither on an observed traffic violation nor on reasonable articulable suspicion that a traffic or equipment violation had occurred or was occurring. Specifically, Defendants argued that (1) the Oklahoma Statute regulating vehicle tag displays, Okla. Stat. Tit. 47 § 1113-A.2, did not apply to out of state vehicles; and (2) the vehicle was not in violation of the Oklahoma statute, Okla. Stat. Tit. 47 § 1113-A.2. The court denied the motions to

-4-

suppress the evidence and, after Defendants entered conditional pleas of guilty, sentenced Arciga to 135 months of imprisonment under the custody of the Bureau of Prisons, with 60 months of supervised release, and Villa-Lopez to 168 months of imprisonment with 60 months of supervised release.

Arciga and Villa-Lopez now separately appeal challenging the district court's denial of the motions to suppress the evidence. Again, they both argue that the initial stop was not lawful. Villa-Lopez also contends that his detention and the search of his vehicle were not justified. Villa-Lopez further contends that his sentence violates the Supreme Court's holding in *Blakely v. Washington*, 124 S.Ct. 2531 (2004), because the district court took into account his prior conduct, as well as his criminal history, before sentencing him to the lower end of the sentencing range. We address these arguments in turn.

## DISCUSSION

## I

In reviewing the denial of a motion to suppress evidence, we accept the district court's findings of fact unless they are clearly erroneous, viewing the evidence in the light most favorable to the government. *United States v. Zubia-Melendez*, 263 F.3d 1155, 1159 (10th Cir. 2001). We review *de novo* the ultimate determination of reasonableness under the Fourth Amendment. *United States v. Horn*, 970 F.2d 728, 730 (10th Cir. 1992). *See also*, *United States v. Zabalza*, 346 F.3d 1255, 1257-58 (10th Cir. 2003); *United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005).

-5-

## A. The Traffic Stop

The law pertaining to routine traffic stops is well established. The Fourth Amendment proscribes unreasonable searches and seizures. *U.S. Const. Amend. IV.* A traffic stop constitutes a Fourth Amendment seizure. *See United States v. Taverna*, 348 F.3d 873, 877 (10th Cir. 2003) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Because a routine traffic stop is more akin to an investigative detention than a custodial arrest, a traffic stop is reasonable if (1) the officer's action was justified at its inception, and (2) the officer's action was reasonably related in scope to the circumstances which justified the interference in the first place. *See United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) (en banc) (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968).

To determine the initial validity of a traffic stop, we ask whether the stop was "objectively justified." *Botero-Ospina*, 71 F.3d at 788. Generally, a routine stop is objectively justified when probable cause or reasonable articulable suspicion exists to believe a traffic violation has occurred. *See Whren v. United States*, 517 U.S. 806, 810 (1996) (probable cause); *Botero-Ospina*, 71 F.3d at 787 (reasonable articulable suspicion). The actual motivations or subjective beliefs and intentions of the officer are irrelevant. *See Whren*, 517 U.S. at 813; *Botero-Ospina*, 71 F.3d at 787. In *Botero-Ospina* the en banc court set forth the standard for examining the constitutionality of a traffic stop:

[A] traffic stop is valid under the Fourth Amendment if the stop is based on an

observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. It is irrelevant, for purposes of Fourth Amendment review, whether the stop in question is sufficiently ordinary or routine according to the general practices of the police department or the particular officer making the stop. It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle. Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.

*Id*. (internal quotations, citations, and footnote omitted).

In the present case, the trooper asserted improper license plate display, which is addressed by Okla. Stat. Tit. 47 § 1113-A.2, as the basis for stopping the vehicle. Arciga and Villa-Lopez argue that the requirement for letters and numbers to be clearly visible under Okla. Stat. Tit. 47 § 1113-A.2 applies to Oklahoma license plates, and Oklahoma license plates only. They assert that consideration of 47 Okla. Stat. § 1113 as a whole, under the doctrine of *in pari materia*, leads to the conclusion that this requirement applies only to tags issued by the Oklahoma Tax Commission. We are not persuaded.

Without doubt, § 1113 of Title 47 Oklahoma Statutes primarily sets forth the procedure and details for tags issued by the State of Oklahoma. However, subsection A.2, dealing with tag placement is not directed toward issuance procedures but rather toward fulfilling a law enforcement function. Title 47, Oklahoma Statutes Annotated, § 1113(A) provides in pertinent part as follows:

(A)(l). Upon the filing of a registration application and the payment of the fees provided for in the Oklahoma Vehicle License and Registration Act, the Oklahoma Tax Commission shall assign to the vehicle described in the application a distinctive number, and issue to the owner of the vehicle a certificate of registration and one license plate or a yearly decal for the year

-7-

that a license plate is not issued . . .

(A)(2). The license plate shall be securely attached to the rear of the vehicle
. . . The license plate, decal and all letters and numbers shall be clearly visible
at all times. The operation of a vehicle upon which the license plate is covered,
overlayed or otherwise screened with any material, whether such material be
clear, translucent, tinted or opaque, shall be a violation of this paragraph.

In the plain words of the statute, a vehicle must have an unobstructed tag on the rear of
the vehicle.[1] And by its terms, subsection (A)(2) applies to any vehicle equipped with a
license plate, whether or not it is from Oklahoma.

Although no Oklahoma appellate court has attempted construction of the
provision, we have found that Oklahoma courts would interpret § 1113-A.2 to apply to
out of state vehicles. *See United States v. DeGasso*, 369 F.3d 1139, 1148-49 (10th Cir.
2004) (defendant's Mexican license plate was obscured by the bumper so that it was not
"clearly visible" from the highway). As we stated in *DeGasso*, this conclusion "accords
with the common-sense proposition that police officers have no less need to identify
out-of-state vehicles than they have to identify those registered in Oklahoma." *Id*. at 1147.
In reaching this conclusion in *DeGasso*, we noted that state courts that have addressed

---

[1] Appellants rely upon *Street v. Tulsa*, 584 P.2d 1364 (Okla.Crim.App. 1978), a
case that is distinguishable from the instant case. In that case, the driver placed the tag
upside down, and all letters were clearly visible and unobstructed. The court found that
while the letters and numbers may have been difficult to read, they were not obstructed.
Therefore, the court concluded that there was no violation of the requirement of a clearly
visible, unobstructed view of the license tag.

In the instant case, the license plate was obstructed, at least partially, by the
decorative border. Thus, *Street* is not controlling.

this issue have reached the same conclusion.[2] Moreover, while every state has some

statute prohibiting the obstruction of license plates, none has interpreted its statutory

scheme to allow out-of-state cars to be driven with obscured license plates. Therefore, we

conclude that Oklahoma courts would interpret § 1113-A.2 to apply to out-of-state

vehicles, including defendants'.

Appellants argue that under the *in pari materia* rule of construction, subsection

A.2 cannot be interpreted in isolation from the context of the whole provision and must be

read to apply only to state issued tags. However, the statute expressly defines the offense

---

[2] *See Id*. at 1148. In *State v. Hayes*, 8 Kan. App. 2d 531, 660 P.2d 1387 (Kan. Ct.
App. 1983), a motorist driving in Kansas with a partially obscured Indiana license plate
was stopped by a trooper for violating the Kansas equivalent of 47 Okla. Stat. § 1113-
A.2. In the course of the stop, the troopers spotted packages of marijuana in plain view in
the vehicle. In ruling on a motion to suppress, the trial court held that the Kansas statute
did not apply to vehicles with out-of-state plates, and thus that the stop was not justified.
The Kansas Court of Appeals reversed, reasoning:

> Taken to its logical extreme, under the restrictive view of our statute taken by
> the trial court an out-of-state motorist could drive with obscured tags or no
> tags at all. . . . The purpose of requiring display of a tag in the first place, and
> legibility of tag displayed, is demonstrated by the very occurrence here. The
> obscured tag frustrated the officers in a routine license plate check. Law
> enforcement officials frequently must determine from tag numbers whether a
> vehicle is stolen; whether it is properly registered; or whether its occupant is
> suspected of a crime, is the subject of a warrant, or is thought to be armed.
> Out-of-state cars on Kansas highways are subject to the same police
> imperative as local vehicles.

*Id*. at 1389. *See also Nelson v. State*, 247 Ga. App. 455, 544 S.E.2d 189, 190 (Ga. App.
2001) (applying Georgia obstruction statute to car with Texas license plates); *People v.
Miller*, 242 Ill. App. 3d 423, 611 N.E.2d 11, 20, 183 Ill. Dec. 158 (Ill. App. 1993)
(treating Illinois statute requiring visible license plates as applicable to a Texas vehicle,
but affirming grant of suppression motion on other grounds).

of operating a vehicle with an obscured license plate as "a violation of this paragraph." 47 Okla. Stat. § 1113-A.2. This indicates that the second paragraph - as opposed to the entirety of § 1113-A. is the legally operative provision. While the first paragraph of the section is limited to Oklahoma vehicles, the second paragraph is not. Thus, it would be inconsistent with the structure of the statute to incorporate limitations from the first paragraph into the second, when the legislature defined the violation solely in terms of the second paragraph. Accepting appellants' argument in the present context would "lead to the absurd result that out-of-state drivers in Oklahoma are free to drive with obscured license plates, or no plates at all." *DeGasso*, 369 F.3d at 1147. In numerous situations (a hit and run accident or a witnessed bank robbery, for example) it is important that a license tag be legible. Therefore, we think it unlikely that the Oklahoma courts would interpret their statute in so restrictive a manner. *Id.* at 1147.

Moreover, the doctrine of *in pari materia* does not require reading a single statute in isolation, but rather also considering other statutes dealing with the same subject matter. *See Planned Parenthood of Rocky Mountains v. Owens*, 287 F.3d 910, 923 n.13 (10th Cir. 2002). *See also United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("Statutory construction . . .is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme...."). Subsection 1113-A.2 is part of the statutory scheme, Title 47 of the Oklahoma Statutes, dealing with the regulation of motor vehicles. Another section of Title 47 Okla. Stat., § 1123, requires non-resident drivers to comply with Oklahoma law

-10-

while driving within the state.[3]  Likewise, Title 47, § 12-101(A)(3) of the Oklahoma Statutes makes it a misdemeanor for "any person . . . to fail to perform an act required under this chapter.[4]  Therefore, under the statutory scheme, there is no distinction between the standards applicable to resident and non-resident drivers.   Accordingly, we conclude that 47 Okla. Stat. § 1113-A.2 applies to all vehicles driven in Oklahoma, whether or not their tags are issued by the Oklahoma authorities.

   This conclusion, however, does not end our inquiry and we proceed to examine whether there was a violation of Oklahoma's motor vehicle law, 47 Okla. Stat. § 1113-

---

[3] Title 47, Oklahoma Statutes Annotated, § 1123 provides in pertinent part:
> The Oklahoma Tax Commission is hereby authorized, empowered to enter into and make reciprocal compacts and agreements when the Commission deems same to be in the interest of the residents of the State of Oklahoma, with the proper authorities of other states, concerning all motor vehicles engaged in foreign and interstate commerce upon and over the public highways.
> Such compacts and agreements shall grant to the residents of other states privileges substantially like and equal to those granted by such states to Oklahoma residents; provided, that such compacts and agreements shall not supersede or suspend any laws, rules or regulations of this state applying to vehicles operated intrastate in this state.

[4] 47 Okla. Stat. § 12-204.1 states

The operation of a vehicle upon which the license plate is surrounded or framed, partially or in whole, by any additional lamp or lamps or otherwise lighted by any additional lamp or lamps, shall be a violation of this section. In addition, display and visibility of the rear license plate shall be in compliance with paragraph 2 of subsection A of Section 1113 of Title 47 of the Oklahoma Statutes.

Okla. Stat. Tit. 47, § 12-204.1(C) (effective November 1, 2003).

A.2, to justify the stop. Appellants argue that there was no violation because the state of issuance, Oregon, was "clearly visible" on the back tag and the front tag of the vehicle was totally uncovered. However, the Defendants-Appellants do not dispute the facts of the case.

Oklahoma Highway Patrol Trooper Cody Hyde was stationed on Interstate 40, observing eastbound traffic when he observed a vehicle driven by Villa-Lopez heading eastbound. As the vehicle passed Hyde, he turned to observe if the passengers were using seatbelts, and when doing so, was unable to determine the state of issuance of the tag on the back of the vehicle. The border surrounding the rear tag covered half of the word "Oregon," the state of issuance. When Hyde initiated the stop, he was unable to read the state of issuance until he was on the shoulder, almost directly behind the vehicle.

These facts were duly before the district court and, as we noted above, were uncontested by the Defendants-Appellants. After reviewing the evidence, the court found that the commercial border surrounding the license tag of the vehicle driven by Villa-Lopez was partially covered which obscured the name of the state of issuance of the tag, and that this was a traffic violation. We give deference to the trial court's factual findings and uphold them unless clearly erroneous. *See Anderson*, 470 U.S. at 573-74 (If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot

-12-

be clearly erroneous).  *See also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 400 (1990) ("In practice, the 'clearly erroneous' standard requires the appellate court to uphold any district court determination that falls within a broad range of permissible conclusions.").  Therefore, we reject Defendants-Appellants' assertion that the state of issuance on the back tag of the vehicle was clearly visible.

In addition, we do not find the fact that the license plate on the front of the vehicle was clearly visible is dispositive in this case.  As noted above, Title 47 Okla. Stat. § 1113-A.2 contemplates licence plates being placed on the rear of the vehicle and requires them to be clearly visible.  Trooper Hyde testified, and the district court found, that he did not see the front tag of the vehicle before he initiated the stop and that when he turned, he could not read the state of issuance on the rear tag until he was on the shoulder, almost directly behind the vehicle.  "Officers should not be required to stop vehicles in order to read their tags."  *United States v. Granados-Orozco*, 2003 WL 22213129 (D. Kan. 2003); *see also*, *United States v. DeGasso*, 369 F.3d 1139 (10th Cir. 2004), where the license plate was "mounted too low obscuring the lettering at the bottom on the tag as a violation of Oklahoma law."  Trooper Hyde also testified that he believed that obstructing the license plate in the manner at issue here was a violation of Oklahoma law.  Based on the testimony and the pictures of the obstruction on the tag, the district court found that Trooper Hyde had a good faith belief the tag violated Oklahoma law and, therefore, had probable cause to believe a traffic violation had occurred.  Because the district court found that the rear tag of appellants' vehicle was not clearly visible, we conclude that the

-13-

initial stop was lawful.

## B. The Detention and Search

Villa-Lopez argues that his detention and the search of his vehicle were not justified. We disagree.

During the pendency of a lawful stop, an officer may ask a detainee a moderate number of questions relevant to the stop. Miranda warnings, in such circumstances, are not required. *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984). In the context of a traffic stop, an officer may request a valid driver's license and proof of entitlement to operate a vehicle, run a computer check, and issue a citation. *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999). After the purpose of the stop is concluded the driver must be allowed to proceed on his trip. However, an officer may further question a driver if during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity, or if consent is obtained. *United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir. 1994).

In determining whether an objectively reasonable suspicion of illegal activity existed, the court does not look to any one particular factor, but must make an evaluation on the basis of the totality of the circumstances. *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir. 1993). Among factors which have justified further questioning are having no proof of ownership of the vehicle, having no proof of authority to operate the vehicle, and inconsistent statements about destination. *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998). *See also United States v. Rivera*, 867 F.2d 1261, 1264

(10th Cir. 1989).

Here an examination of the totality of the circumstances reveals that Hyde had a reasonable suspicion of illegal activity which justified the limited detention of Villa-Lopez after the completion of the traffic stop. Trooper Hyde observed excessive, inexplicable nervousness on the part of Villa-Lopez. Trooper Hyde testified that typically, individuals who are advised that they are only going to receive a warning tend to calm down. Trooper Hyde testified, and the court found, that Villa-Lopez's extreme nervousness never subsided during the contact. Although nervousness alone is not a sufficient basis to establish reasonable suspicion, unreasonable and excessive nervousness may be viewed in combination with other factors to establish a reasonable basis for suspicion of illegal activity. *United States v. Williams*, 271 F.3d 1262, 1267, 1268-69 (10th Cir. 2001) (citing *United States v. West*, 219 F.3d 1171, 1179 (10th Cir. 2000)); *United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991). The nervousness of Villa-Lopez in combination with other factors justified the brief detention for the purpose of further questions.

Additionally, during the traffic stop Hyde was advised of a suspicious lack of knowledge regarding travel plans. Villa-Lopez informed Hyde that he and his passenger were planning to visit his family in Little Rock, Arkansas, but was unable to provide an address of his relatives. We have held that questions to the driver regarding travel plans are permissible. *United States v. Williams*, 271 F.3d at 1267; *United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001); *United States v. Rivera*, 867 F.2d

1261, 1264 (10th Cir. 1989); *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998). Although Villa-Lopez stated the passenger was a friend he had known for three years, he could not provide the passenger's name.

During the traffic stop, Trooper Hyde learned that Villa-Lopez's driver's license had been issued in Washington although the car was tagged out of Oregon. Hyde further determined that Villa-Lopez had obtained insurance on the vehicle days before the departure, which is not uncommon for drug couriers in Hyde's experience. While no one factor is dispositive, we are convinced that the combination of these factors in this case is sufficient to give rise to an objectively reasonable suspicion of illegal activity. Therefore, we conclude that Villa-Lopez's detention was justified under the circumstances. Moreover, as discussed below, the search that followed was consented to by Villa-Lopez.

### C. Voluntariness of Consent

Villa-Lopez argues that the consent gained to search his vehicle was not an act of free will but the act of a man that felt pressured and intimidated by the Trooper to give consent. We are not persuaded.

An officer may conduct a warrantless search of a vehicle without violating the Fourth Amendment if the person in control of the vehicle voluntarily consents to the search. *Zubia-Melendez*, 263 F.3d at 1162. However, when the government relies on a defendant's consent for the validity of a search, the government bears the burden of proving that defendant's consent was freely and voluntarily given, a determination made by evaluating the totality of the circumstances. *United States v. McRae*, 81 F.3d 1528,

1536-37 (10th Cir. 1996). "[V]oluntariness is a question of fact to be determined from all of the circumstances[.]" *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973). In determining the voluntariness of a consent to search, we have applied a two-step test: the government must (1) "proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given" and (2) "prove that this consent was given without implied or express duress or coercion." *McRae*, 81 F.2d at 1537 (quoting *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir.1995)).

In the instant case, the totality of the circumstances supports the finding that Villa-Lopez voluntarily consented to Trooper Hyde's search of his vehicle. Trooper Hyde returned the warning and driver's license to Villa-Lopez, advising him that he was free to go. As Villa-Lopez opened the door to leave Hyde's patrol unit, Hyde asked if he could ask additional questions. Villa-Lopez said that he could, and Hyde asked if Villa-Lopez was transporting any weapons or narcotics to which Hyde received negative responses. Then Hyde asked Villa-Lopez if he could search his car. Villa-Lopez responded affirmatively.

We have held that:

[A]fter the point at which the driver has his or her other documentation back, the touchstone of our analysis is simply whether–adapting the language of *Bostick* to the circumstances of a traffic stop–the driver (*United States v. Werking,* 915 F.2d 1404 1408 (10th Cir. 1990)):

has an objective reason to believe that he was not free to end his conversation with the law enforcement officer and proceed on his way.

-17-

> Where such a belief is present based on the "objective" facts of the situation, a voluntary police-citizen encounter is said to arise (see, e.g., *McKneely*, 6 F.3d at 1451-53; *Werking*, 915 F.2d at 1409).

*Sandoval*, 29 F.3d at 540.

A reasonable person in Villa-Lopez's position would have believed he was free to leave once he was told that he was free to go. And Villa-Lopez must have believed he was free to leave after he was given his documents because the district court found he turned to get out of the car. Villa-Lopez asserts that he was not at liberty to leave. However, he does not present any evidence in support of this assertion and nothing suggests that he was under any duress or coercion. Therefore, the finding of the district court that Villa-Lopez voluntarily consented to the search was not clearly erroneous.

### D. Search and Seizure

Villa-Lopez also argues that the search of his vehicle was only based upon "unlawful actions" by Trooper Hyde, so that the consent is tainted. However, as we have shown above, the stop, detention, and concomitant search were lawful. Therefore, we reject his argument and uphold the district court's denial of his motion to suppress evidence.

### II

On appeal, Villa-Lopez also argues that the district court's consideration of his prior conduct and application of the Sentencing Guidelines is unconstitutional and violates *Blakely v. Washington*, 124 S.Ct. 2531 (2004). In light of *United States v. Booker*, 160 L. Ed. 2d 621, 125 S. Ct. 738, 2005 WL 50108, at *13-14 (2005), Villa-

Lopez's *Blakely* argument is foreclosed.[5]  Therefore, we review this appeal under *Booker* standards.

We recognize two types of *Booker* errors: constitutional and non-constitutional. *United States v. Gonzalez-Huerta*, 403 F.3d 727, 731 (10th Cir. 2005).  A constitutional *Booker* error may arise when a court "[relies] upon judge-found facts, other than those of prior convictions, to enhance a defendant's sentence mandatorily."  *Id.*  A non-constitutional error may occur when a sentencing court "appl[ies] the Guidelines in a mandatory fashion, as opposed to a discretionary fashion, even though the resulting sentence was calculated solely upon facts that were admitted by the defendant, found by the jury, or based upon the fact of a prior conviction."  *Id.* at 731-32.

Here, the district court made a constitutional *Booker* error because Villa-Lopez's sentence was enhanced on the basis of judicially found facts.[6]  Because Villa-Lopez

_____

[5] Defendant Villa-Lopez was sentenced on November 10, 2004.  Later the Supreme Court issued its decision in *United States v. Booker*, 125 S.Ct. 738 (2005), extending its holding *Blakely v. Washington*, 124 S.Ct. 2531 (2004), to the United States Sentencing Guidelines, and holding that the Sixth Amendment requires "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id*. at 756.  To remedy the Sixth Amendment violation inherent in the Guidelines, the court severed and excised 18 U.S.C. § 3553(b)(1), which required sentencing courts to impose a sentence within the applicable guidelines range, subject to departures in limited cases.  *Id.* at 764-65.  As a result, the guidelines are now advisory in all cases.  *Id.* at 757.

[6] Villa-Lopez does not object to a particular finding in the presentence report, but instead appears to have made a generalized *Blakely* challenge to the Sentencing Guidelines.  Nevertheless, the government concedes that the district court imposed the U.S.S.G. § 2D1.1 enhancement to Villa-Lopez's sentence on the basis of judicially found facts.  (*See* Aplee. Br. at 21).  Therefore, we presume that the district court's error in this

-19-

timely asserted a *Blakely* based objection to the enhancement, that enhancement would be reviewed for harmless error.  *See* Federal Rules of Criminal Procedure 52(a).  As a "beneficiary" of the constitutional error, the government would bear the burden of establishing harmlessness beyond a reasonable doubt.  *See Chapman v. California*, 386 U.S. 18, 24 (1967).  Where a defendant preserves a potential *Booker* error, this court will remand if the error was not harmless.  *See United States v. Labastida-Segura*, 396 F.3d 1140 (10ᵗʰ Cir. 2005); Federal Rules of Criminal Procedure 52(a).

The government concedes that Villa-Lopez's timely *Blakely* objection adequately preserved his *Booker* argument, but it contends that the error was harmless.  Fed. R. Crim. P. 52(a) provides that "any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."  In the context of a misapplication of the Guidelines under 18 U.S.C. § 3742(f)(1), the Supreme Court has held that "once the court of appeals has decided that the district court misapplied the Guidelines, a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless, i.e., that the error did not affect the district court's selection of the sentence imposed." *Williams v. United States*, 503 U.S. 193, 203, 117 L. Ed. 2d 341, 112 S. Ct. 1112 (1992) (citing Fed. R. Crim. P. 52(a)); *see also Labastida-Segura*, 396 F.3d at 1142-43.

In the present case, the sentence was at the bottom of the Guidelines range.

_____

case is a constitutional *Booker* error.

-20-

Therefore, we cannot conclude that the district court would have imposed the same sentence, given the new *Booker* standards, without the judge-found facts. To say otherwise "places us in the zone of speculation and conjecture-we simply do not know what the district court would have done." *See Labastida-Segura* at 1143. Therefore, we conclude that the error in this case was not harmless and remand for resentencing.

## CONCLUSION

The district court's denial of suppression of the evidence is affirmed in both appeals. However, we remand for the district court to resentence Villa-Lopez, consistently with the Supreme Court's ruling in *United States v. Booker*, 125 S. Ct. 738 (2005).

Entered for the Court

William J. Holloway, Jr.
Circuit Judge