*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0138p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

　　　　　　　*Plaintiff-Appellee,*

v.

DAVID SIMPSON,

　　　　　　　*Defendant-Appellant.*

No. 07-5486

>

---

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 06-00021—Harry S. Mattice, Jr., District Judge.

Argued: February 5, 2008

Decided and Filed: April 3, 2008

Before: BOGGS, Chief Judge; and BATCHELDER and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Gerald H. Summers, SUMMERS & WYATT, Chattanooga, Tennessee, for Appellant. Perry H. Piper, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** Gerald H. Summers, Marya L. Wegenka, SUMMERS & WYATT, Chattanooga, Tennessee, for Appellant. Robert C. Anderson, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

---

## OPINION

---

　　　　BOGGS, Chief Judge. David Simpson entered a conditional guilty plea to possession, with intent to distribute, of 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), reserving his right to appeal the district court's denial of his motion to suppress. Simpson argues that the police officer had neither probable cause nor reasonable suspicion of any illegal behavior that would justify stopping Simpson's vehicle, and that the seizure and subsequent search therefore violated the Fourth Amendment. We agree with the district court that there was no constitutional violation, and we therefore affirm, but we do not rely on the district court's overly broad interpretation of the Tennessee statute at issue.

### I. Background

　　　　On February 21, 2006, at around 8 p.m., Officer Andy Ratcliff of the Cleveland, Tennessee Police Department was parked near the 23-mile marker on Interstate 75, observing northbound

traffic.  A black Nissan Maxima "caught [his] eye" because of the vehicle's "extremely dark" window tinting, and a "weathered" temporary license plate that was not "clearly legible." Tennessee law exempts out-of-state vehicles from window tinting regulations, *see* TENN. CODE ANN. ("T.C.A.") § 55-9-107, but Officer Ratcliff nevertheless pulled out to follow the car in order to confirm whether the "tag was illegible."  The officer required about two miles to catch up to the Maxima, after which he followed it for approximately two more miles.  He estimated that he followed, at times, within a single car length of the Maxima.  The officer could see that the tag was from Ohio and could read the tag number (which was printed in large, bold numbers), but could not read the expiration date (which was handwritten with a relatively thin black marker on a piece of silver metallic tape immediately underneath the tag number).  Additionally, the officer testified that he could see that the tag was "torn and very weathered," that a portion of the tag was "flapping," that the top of the tag was bolted on but the bottom was secured only with duct tape, and that the whole tag was "coming apart basically."  Because the expiration date was not "clearly legible," the officer believed that the tag was not in compliance with T.C.A. § 55-4-110(b) (governing the display of license plates) and so executed a traffic stop by activating his emergency lights.

Once the vehicle stopped, Officer Ratcliff got out of his patrol car and shined his flashlight directly on the tag.  He testified, "[The tag] was torn.  It was really weathered, discolored.  The actual expiration date [was] written on what appear[ed] to be some sort of tape . . . [that] the state of Ohio would put on the plate, and it was wrinkled and bubbled up."  It spite of its deteriorated condition, the officer could then see that the tag had not expired, but was in fact valid for one more day.  The officer approached the passenger side of the vehicle; when the female passenger lowered the window, he could immediately detect the stench of burnt and raw marijuana.  After asking Simpson for his license, Simpson—without prompting from the officer—asked whether his tag had fallen off.  Officer Ratcliff replied, "[N]o, but it looks like it could at any moment."  Simpson told the officer that he had recently stopped at a gas station and put duct tape on the tag to secure it to the vehicle, presumably recognizing its precarious condition.[1]  Officer Ratcliff asked for permission to search Simpson's vehicle, which was refused.  The officer (who was a trained K-9 handler) used his dog to sniff the car, and the dog alerted.  The vehicle was then searched and three kilograms of cocaine were found hidden in the trunk.

Simpson moved to suppress this evidence, arguing that Officer Ratcliff lacked sufficient legal justification to seize him under the Fourth Amendment.  The magistrate judge issued a report recommending that the motion be denied.  Although the magistrate judge agreed that the illegibility of the expiration date may have violated Tennessee law, he did not base his recommendation solely on those grounds, citing a Fourth Circuit case that held that the inability of a police officer to see the expiration date on an otherwise lawfully displayed temporary tag did not give the officer reasonable suspicion. *See United States v. Wilson*, 205 F.3d 720 (4th Cir. 2000) (en banc).  Instead, the magistrate judge distinguished *Wilson* and recommended denying the motion to suppress based on the deteriorated condition of the tag, stating that the tag's condition gave the officer "a reasonable and articulable suspicion that the temporary tag was so old it had expired . . . ."  Once the officer had ascertained that the tag was still valid, "it was not unreasonable under Fourth Amendment standards for [Officer] Ratcliff to approach the vehicle to explain why he had stopped it in the first place.  This action took only seconds and constituted part of the original traffic stop."  The odor of marijuana then gave the officer grounds for further detention, culminating in full-blown probable cause to search the car once the dog alerted.

The district court accepted the magistrate judge's statement of relevant facts, but denied Simpson's motion to suppress on different legal grounds.  Concluding that it was unnecessary to "determine whether the temporary tag appeared weathered and worn[,]" the court concluded that the

---

[1]  In the dashboard-camera video recording of the encounter, which is otherwise unilluminating, Simpson can be seen pointing out to the officer where he affixed the duct tape.

illegibility of the expiration date gave Officer Ratcliff probable cause to stop the vehicle under Tennessee law. *United States v. Simpson*, No. 1:06-CR-21, 2006 WL 3198945, at \*1 (E.D. Tenn. Oct. 30, 2006). Regarding the Fourth Circuit's *Wilson* opinion, the district court concluded that an unpublished Sixth Circuit case contradicted it, and that the district court was "obligated" to follow the Sixth Circuit precedent. *Id.* at \*4 (citing *United States v. Dycus*, 151 F. App'x 457 (6th Cir. 2005)).[2] The district court construed T.C.A. § 55-4-110(b) extremely broadly, concluding

> that *any* invisibility or obstruction to visibility of *any portion* of the tag could constitute a violation of the statute, even if such invisibility or obstruction to visibility is temporary—or even momentary—and may be easily cured, as by the turning on of headlights or by a slight change in distance or the position of the vehicle in relation to the observer.

*Ibid.* Although initially holding that Officer Ratcliff had probable cause, *id.* at \*3, the district court concluded its analysis by instead stating that the officer "had at least a reasonable suspicion of violation of [T.C.A.] § 55-4-110(b) . . . ." *Id.* at \*5.

Having failed in his motion to suppress, Simpson entered a conditional guilty plea pursuant to Federal Rule of Criminal Procedure 11(a)(2) and appealed to this court.

## II. Analysis

"When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *United States v. Foster*, 376 F.3d 577, 583 (6th Cir. 2004) (quoting *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000)). In this case, the district court adopted the magistrate judge's findings of fact, which included the determination that Officer Ratcliff testified credibly regarding the illegibility and deteriorated condition of the temporary license plate. We may reject this finding only if "on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). Our examination of the record leaves us with no such conviction; we therefore accept the magistrate judge's factual findings as correct and focus our inquiry on the question of which legal standard—reasonable suspicion or probable cause—governs this traffic stop, and whether that standard was met.

### A. Choice of Law

As a threshold matter, we must determine which state's law applies to Simpson's temporary license plate. Although it might first appear obvious that a vehicle traveling on Tennessee's highways must abide by Tennessee's motor vehicle laws, Simpson argues that the display of an Ohio-registered vehicle's license plate must be judged by Ohio law, rather than by Tennessee law, because (1) the Tennessee statute at issue does not apply to out-of-state vehicles, and (2) Tennessee gives reciprocity to Ohio's vehicle registration laws. The emphasis Simpson places on this point is understandable given that his temporary tag arguably did not violate any Ohio law.[3] Nevertheless, for the following reasons, we hold that Tennessee law applies and that Simpson was obliged to follow that law while in Tennessee.

---

[2] We note in passing that, because *Dycus* is an unpublished opinion, the district court was mistaken in its assumption that it was "obligated" to follow that case. *See United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007); 6th Cir. Rule 206(c). At any rate, we conclude that *Dycus* is inapposite. *See* n.14 *infra*.

[3] *Cf.* Ohio Rev. Code Ann. § 4503.21(A) (requiring only that a temporary plate be kept "in plain view" and not "be covered by any material that obstructs its visibility").

1. Statutory Construction

The relevant portion of Tennessee motor vehicle law states,

> Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so to prevent the plate from swinging and at a height of not less than twelve inches from the ground . . . in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be *clearly legible*.

T.C.A. § 55-4-110(b) (emphasis added). As far as this court can determine, no Tennessee court of record has ever specifically applied § 55-4-110 (or any other analogous part of Tennessee motor vehicle law) to an out-of-state vehicle.[4] The United States District Court for the Middle District of Tennessee has, on one occasion, applied the statute in question to an out-of-state vehicle. *See United States v. Walton*, No. 1:03-00014, 2004 WL 3460842, at *4 (M.D. Tenn. Nov. 12, 2004) (denying motion to suppress and finding reasonable suspicion of a violation of T.C.A. § 55-4-110(b), where license plate frame obscured the word "Texas," the state of registration).

When there is no state law construing a state statute, a federal court must predict how the state's highest court would interpret the statute. *See Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) ("In construing questions of state law, . . . [i]f the state's highest court has not addressed the issue, the federal court must attempt to ascertain how that court would rule if it were faced with the issue."). Although more generally cited in the context of civil diversity cases, this rule is equally applicable in criminal matters. *See United States v. Philp*, 460 F.3d 729 (6th Cir. 2006) (applying predictive framework to issue of state criminal law); *United States v. DeGasso*, 369 F.3d 1139, 1145 n.5 (10th Cir. 2004) (rejecting argument that "the obligation of a federal court . . . to predict what the state's highest court would do[] applies only in 'civil diversity cases' and not in 'the criminal context'"). While ordinarily a state's intermediate appellate court decisions are the best authority in the absence of any supreme court precedent, no such decisions exist on this issue. We therefore apply the general rules of statutory construction as embraced by the Tennessee judiciary. As recently explained by the Tennessee Court of Criminal Appeals,

> The basic rule of statutory construction is to ascertain and give effect to the intent or purpose of the legislature as expressed in the statute. *Metropolitan Gov't of Nashville & Davidson Co. v. Motel Sys., Inc.*, 525 S.W.2d 840, 841 (Tenn. 1975); *State v. Southland News Co., Inc.*, 587 S.W.2d 103, 106 (Tenn. Crim. App. 1979). We must consider the "natural and ordinary meaning of the language used, when read in the context of the entire statute, without any forced or subtle construction to limit or extend the import of that language." *Worrall v. Kroger Co.*, 545 S.W.2d 736 (Tenn. 1977).

*State v. Camacho*, No. E2005-02699-CCA-R3-CD, 2007 WL 3145003, at *7 (Tenn. Crim. App. Oct. 29, 2007). With these principles in mind, we proceed now to interpret the proper scope of § 55-4-110(b).

As a purely textual matter, the statute applies on its face to "[e]very registration plate," not just Tennessee plates. Indeed, it would be an odd construction that would exempt vehicles with out-of-state plates from the obligation to have "visible" and "legible" plates, since the purposes of the statute (presumably to provide ready identification of motor vehicles traveling on Tennessee

---

[4] The paucity of searchable common law on the topic is likely due to the fact that traffic offenses in Tennessee are tried in Municipal and General Session courts, which are not courts of record. Indeed, there are only a handful of recorded Tennessee cases that even mention the vehicular registration laws at all, and none in the context of applying such laws to out-of-state vehicles.

highways) would surely be frustrated if those passing through the state did not have to comply with this statute. In a similar case, the Tenth Circuit agreed with this commonsense proposition and construed an Oklahoma statute requiring license plates to be "clearly visible at all times" to apply to out-of-state plates, even though there was no state court precedent so holding. *DeGasso*, 369 F.3d at 1145-46 ("Contrary to Defendants' assertion, we think it far more likely that the Oklahoma court would interpret its law to apply to out-of-state drivers, rather than to liberate out-of-state drivers from the obligation of displaying legible license plates."). Other states' courts, when confronted with the issue of whether their statutes governing license plate display apply to out-of-state vehicles, have concluded that they do. *See Nelson v. State*, 544 S.E.2d 189, 190 (Ga. Ct. App. 2001) (interpreting Georgia statute requiring license plate to be "legible at all times" as applying to out-of-state plates); *People v. Miller*, 611 N.E.2d 11, 20 (Ill. App. Ct. 1993) (treating Illinois statute requiring license plate to be "clearly visible" as applying to a Texas-registered vehicle); *State v. Hayes*, 660 P.2d 1387, 1389 (Kan. Ct. App. 1983) (interpreting Kansas statute virtually identical to § 55-4-110(b), and concluding that "the display of an illegible or obscured vehicle tag is a violation . . . even if the vehicle is duly licensed in another state"). We think the Tennessee court would similarly construe the words "[e]very registration plate" in § 55-4-110(b) to mean *every* registration plate.

Nevertheless, Simpson points to identical language in T.C.A. § 55-4-103(b)(1) that unquestionably does *not* apply to out-of-state plates: "Every registration plate shall have displayed upon it, in addition to a registration number, . . . the abbreviation of the word, 'Tennessee' . . . ." Appellant's Br. at 23. These two statutes must be read *in pari materia*, he argues, and the words "every registration plate" should be construed identically in both code sections. Appellant's Reply Br. at 15. This argument is unpersuasive because the statutory context in which those words appear is vastly different. Section 103 is headed "Registration plates furnished by department — Form and contents — Size"[5] and is directed at the Tennessee Department of Safety; it deals specifically with the *design* of the license plate, not its *display* on a vehicle. Section 103 begins, "The department shall likewise furnish to the county clerks of the various counties of the state all registration plates of all types which may be required by the county clerks *in the exercise of the duties in subdivision (b)(1) imposed upon them.*" T.C.A. § 55-4-103(a) (emphasis added). Section 103(b)(1), then, is specifically directed at county clerks charged with issuing license plates, not at motorists. In this context, the language "[e]very registration plate" obviously pertains only to Tennessee license plates—county clerks could have no authority to issue any other state's plates. Section 110, on the other hand, is headed "Display of registration plates — Manner — Penalty for violation" and requires *motorists* to display license plates on their vehicles in accordance with its terms. Unlike section 103, which provides no penalty for any violation, section 110 provides that "[a] violation of this section is a Class C misdemeanor" and imposes a $10 fine for a first offense. Differing statutory contexts justify differing interpretations. There is no reason to believe that the Tennessee legislature, in using the words "[e]very registration plate" in section 110, somehow meant to exclude non-resident motorists from that statute's requirements.

## 2. Reciprocity

Simpson's reciprocity argument is similarly unavailing. It is true that Tennessee grants reciprocity to other states' registration laws, but it does not follow that this relieves out-of-state motorists from the obligation, imposed on them by § 55-4-110(b), to keep their license plates "clearly legible." Tennessee's reciprocity statute states:

---

[5] We note that the Tennessee courts have determined that "it is perfectly permissible under widely accepted principles of statutory construction to look to these headings in the quest to determine legislative intent." *State v. Gray*, No. M2006-00398-CCA-R3-CD, 2007 WL 4547970, at *8 (Tenn. Crim. App. Dec. 17, 2007) (citing 2A NORMAN J. SINGER, SUTHERLAND'S STATUTORY CONSTRUCTION § 47:14 (6th ed. 2000)).

The commissioner is authorized to enter into reciprocal agreements with proper officials of other states under which agreements motor vehicles of nonresident owners properly licensed and bearing license tags or plates of such states may be operated over the highways of the state, and without being registered or licensed in the state . . . .

T.C.A. § 55-4-121(a). There is no relevant Tennessee case law interpreting this provision, but by its plain terms it would appear simply to permit properly registered out-of-state vehicles to travel on Tennessee roads, i.e., it permits out-of-state plates, but does not speak to the manner in which those plates must be displayed. It cannot, therefore, override the unambiguous text of § 55-4-110(b) requiring every registration plate to be clearly legible.[6] Apart from the general reciprocity statute, there is no indication of any specific agreement with Ohio that would bear on this case.

Moreover, if this court were to adopt Simpson's reasoning—that the laws of the state of registration apply—it would essentially require police officers to be knowledgeable of fine details of the laws governing the display of license plates in all fifty states. We are unwilling to impose such an unrealistic burden on law enforcement.[7]

## B. Applicable Standard

Having determined that Tennessee law governed the display of Simpson's Ohio-issued temporary license plate while he traveled in Tennessee, we now must determine whether Officer Ratcliff was required to have probable cause or merely reasonable suspicion that § 55-4-110(b) was being violated before executing a traffic stop.

Our circuit's case law on this issue has not been entirely clear, at least with regard to traffic violations. *See United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) ("There is a degree of confusion in this circuit over the legal standard governing traffic stops."). Certain panel decisions have held that reasonable suspicion is sufficient to justify a stop for a traffic violation, whereas others have stated that probable cause is required. *Compare United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004) (upholding stop where officer had "reasonable suspicion" that driver's license had been suspended) *and Weaver v. Shadoan*, 340 F.3d 398, 407-08 (6th Cir. 2003) (upholding stop where police had "reasonable suspicion" of a violation of vehicle registration and window tinting regulations) *with United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (invalidating stop where police lacked "probable cause" to stop vehicle for failure to stay in lane).

The earliest decision on point is *Freeman*, where the panel concluded that Tennessee police were *not* justified in stopping a motor home that briefly veered out of its lane of travel, in potential violation of T.C.A. § 55-8-123, which requires that a vehicle "shall be driven as nearly as practicable

---

[6] We do not mean to suggest, however, that a reciprocity statute like Tennessee's could never abrogate certain provisions of state motor vehicle law for out-of-state travelers. For example, where a state requires the display of a front license plate, a motorist traveling in a vehicle registered in a state without such a requirement could not be expected to affix a front plate to his vehicle at the border. As explained *supra*, however, we do not think the requirement to keep a license plate "clearly legible" is one of those provisions that reciprocity was intended to abrogate.

[7] In his reply brief, Simpson elevates his reciprocity argument to a constitutional challenge, arguing that the Full Faith and Credit Clause *requires* Tennessee to give reciprocity to Ohio's motor vehicle registration laws, including (presumably) its law governing the display of license plates. Appellant's Reply Br. at 6. Even if this were true (which we doubt), such a constitutional challenge has no bearing on a probable cause/reasonable suspicion determination. A police officer, "unschooled in the jurisprudence of constitutional federalism . . . , is entitled to presume that a duly adopted [law] which he was sworn to enforce comports with the American Constitution . . . , absent facial invalidity or a contrary controlling judicial decree." *United States v. Moreno*, 43 F. App'x 760, 767 (6th Cir. 2002); *see also Illinois v. Krull*, 480 U.S. 340, 349-50 (1987) ("Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law."). Officer Ratcliff was thus entitled to presume that § 55-4-110(b) was valid in application to Simpson's Ohio-registered vehicle.

entirely within a single lane." 209 F.3d at 465. The *Freeman* panel determined that "one isolated incident of a large motor home partially weaving into the emergency lane for a few feet and [at] an instant in time" did not give the officer probable cause to believe that the statute had been violated. *Id.* at 466. The panel cited an earlier en banc case, in which this court stated in dicta that "so long as the officer has *probable cause* to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful." *Ibid.* (quoting *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc)) (emphasis added); *see also United States v. Jenkins*, 92 F.3d 430, 436 n.1 (6th Cir. 1996) (citing *Ferguson* for the proposition that "probable cause [is] needed to stop [an] automobile for [a] traffic infraction"). The panel went on to opine that the officers similarly lacked probable cause for a drunken driving violation based on the single instance of wayward driving. *Ibid.* The *Freeman* panel never mentioned whether *reasonable suspicion* of a violation would have been sufficient to justify the stop; the opinion was authored exclusively in the language of probable cause.

A later case attempted to resolve the intra-circuit split, at least with regard to drunken driving. In *Gaddis v. Redford Twp.*, 364 F.3d 763 (6th Cir. 2004), the panel reviewed the history of the intra-circuit split on this issue and noted that the original "bedrock rule that reasonable suspicion of a crime justifies a brief stop" had potentially gone awry in *Freeman*. *Id.* at 770. *Gaddis* reasserted the original rule, and argued that both earlier Sixth Circuit and intervening Supreme Court precedent repudiated the implication in *Freeman* that *only* probable cause would suffice to justify detention of someone suspected of drunken driving. *Id.* at 769-70. In a lengthy footnote, the *Gaddis* panel then provided guidance to the district courts by way of summarizing the state of our circuit's Fourth Amendment jurisprudence:

> Police may make an investigative stop of a vehicle when they have reasonable suspicion of an ongoing crime, whether it be a felony or misdemeanor, including drunk driving in jurisdictions where that is a criminal offense. . . . Police may also make a stop when they have reasonable suspicion of a completed felony, though not of a mere completed misdemeanor. . . .

> Next, police may make a stop when they have probable cause to believe a civil traffic violation has occurred . . . . Whether they may also stop a vehicle based on mere reasonable suspicion of a traffic violation is the subject of another conflict in our case law. . . .

> Gaddis's case does not require us to resolve this last issue. We note, though, that the issue appears to be controlled by *Freeman*, the earlier panel holding on point, a conclusion reinforced by this court's embrace of the probable cause requirement for traffic violations in dictum [in] its *en banc* opinion in *Ferguson*.

*Id.* at 771 n.6 (citations omitted). Thus, *Gaddis* did not resolve the question of whether, and under what circumstances, reasonable suspicion can justify an investigatory stop for a traffic violation.[8] As the earliest panel holding on point, *Freeman* controls, *see Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001), and appears to require probable cause.

We note that virtually every other circuit court of appeals has held that reasonable suspicion suffices to justify an investigatory stop for a traffic violation. *See United States v. Booker*, 496 F.3d

---

[8] Although the *Gaddis* footnote initially appears to conclude that *all* criminal offenses (other than completed misdemeanors) are governed by the reasonable suspicion standard, which presumably includes at least some traffic violations, the latter part of the footnote contradicts that assumption. This is because the statute at issue in *Freeman* was not a civil infraction, as *Gaddis* appears to assume, but rather a "Class C misdemeanor"—a criminal offense. *See* T.C.A. § 55-10-301(a). *Freeman* cannot, therefore, be distinguished on the basis that the offense here was a criminal rather than civil infraction.

717, 721 (D.C. Cir. 2007) (applying reasonable suspicion standard to stop for improper display of temporary license plate); *United States v. Pierre*, 484 F.3d 75, 84 (1st Cir. 2007) (upholding traffic stop because officer had reasonable suspicion that driver's license was suspended); *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006) (joining the other circuits "in holding that the *Terry* reasonable suspicion standard applies to routine traffic stops," in case involving driver's obstructed vision); *United States v. Bueno*, 443 F.3d 1017, 1024-25 (8th Cir. 2006) (upholding stop on reasonable suspicion grounds where officers could not see temporary registration affixed to vehicle's windshield until after the stop); *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir. 2005) ("The Fourth Amendment requires that an officer making . . . a stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation . . . ."); *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) ("For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur . . . ."); *United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003) ("[A] traffic stop is a constitutional detention if it is justified by reasonable suspicion under *Terry* or probable cause to believe a traffic violation has occurred . . . ."); *United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001) (holding that cracked windshield gave officer reasonable suspicion to stop vehicle and stating that "[w]hile either probable cause or reasonable suspicion is sufficient to justify a traffic stop, only the lesser requirement of reasonable suspicion is necessary"); *United States v. Lopez-Soto*, 205 F.3d 1101, 1104-05 (9th Cir. 2000) (joining the other circuits and "reaffirm[ing] that the Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops," in case involving display of registration sticker); *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993) (holding that "an ordinary traffic stop . . . must be justified by probable cause or reasonable suspicion, based on specific and articulable facts," such as the commission of a traffic offense).[9] These cases appear consistent with the Supreme Court's statement that a routine traffic stop "is a relatively brief encounter and is more analogous to a so-called '*Terry* stop' than to a formal arrest." *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (internal quotation omitted). Given this overwhelming precedent, we have grave doubts about the correctness of *Freeman* (as well as the dicta in *Ferguson* upon which *Freeman* relied). Nevertheless, "[a] panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Darrah*, 255 F.3d at 309 (quoting *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)).

We believe, however, that the current case is distinguishable from *Freeman* because the violation here was *ongoing*. *Freeman* concerned a single, isolated incident of a large motor home drifting into the shoulder—if there was any violation at all of Tennessee's traffic law, it was a completed violation. Our case law has asserted, albeit in dicta, that reasonable suspicion of a completed misdemeanor is not sufficient to justify an investigatory stop. *See Gaddis*, 364 F.3d at 771 n.6 (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985); *United States v. Roberts*, 986 F.2d 1026, 1030 (6th Cir. 1993)).[10] But reasonable suspicion of an ongoing misdemeanor *is*

---

[9] Although *United States v. Hill*, 195 F.3d 258 (6th Cir. 1999), which antedates *Freeman*, has been cited as agreeing with the understanding that reasonable suspicion governs traffic stops, *see Delfin-Colina*, 464 F.3d at 396 (listing the Sixth Circuit as among those in accord and citing *Hill*), our own reading of *Hill* leads us to doubt that conclusion. Although *Hill* did state that "the principles announced in *Terry* . . . apply to define the scope of reasonable police conduct" in the context of a traffic stop, 195 F.3d at 264, the opinion later states that "an officer may stop a vehicle for a traffic violation . . . as long as the officer had probable cause," *ibid.*, and later still notes that "the stop was valid as long as [the officer] had probable cause to make the traffic stop." *Id.* at 265 (citing *Whren v. United States*, 517 U.S. 806, 812-13 (1996)). We do not, therefore, believe that *Hill* supersedes *Freeman*.

[10] On this point, we again appear out-of-step among the circuits as asserting a *per se* rule that reasonable suspicion cannot justify an investigatory stop for a completed misdemeanor. *See United States v. Hughes*, — F.3d —, 2008 WL 482414, at *3 (8th Cir. 2008) (joining the Ninth and Tenth Circuits in "refus[ing] a *per se* standard," and instead "balanc[ing] the individual's interest with the governmental interest on a case-by-case basis"); *United States v.*

adequate justification. *See Sandridge*, 385 F.3d at 1036 (driving on suspended license); *Shadoan*, 340 F.3d at 407-08 (registration and window tinting violations); *Roberts*, 986 F.2d at 1029-30 (drunken driving). Since failure to keep a license plate "clearly legible" is an ongoing violation of § 55-4-110(b), the standard of reasonable suspicion applies. Thus, while we generally agree with *Gaddis*'s description of the current state of our circuit's Fourth Amendment jurisprudence, we wish to emphasize that a seizure for an ongoing violation of *any* crime—no matter how minor—is governed by the standard of reasonable suspicion, not probable cause.[11]

Because this violation of T.C.A. § 55-4-110(b) was an ongoing criminal offense, we hold that the requisite justification for an investigatory stop under the Fourth Amendment was reasonable suspicion.

## C. Reasonable Suspicion

Simpson argues that Officer Ratcliff could not have had a reasonable suspicion that any violation of Tennessee law was occurring because § 55-4-110(b) does not apply to temporary tags, only to permanent license plates. As before, this court must construe the scope of the Tennessee statute. Logically, simply because section 110 fails to specify that it includes temporary tags does not mean that such tags are excluded from the broad language "[e]very registration plate." *See United States v. Foster*, 65 F. App'x 41, 44 (6th Cir. 2003) ("[T]he lack of a specific provision in the Kentucky code dealing with temporary license tags does not necessarily imply that they need not also be illuminated at night. More logically, the absence of a provision exempting temporary tags from the general applicability of K.R.S. § 186.170(1) supports the proposition that they are subject to the same illumination requirements as are permanent plates."). Importantly, there is also Tennessee case law (albeit unpublished) that implicitly recognizes the applicability of § 55-4-110 to temporary license plates. *See State v. Hammonds*, No. M2005-01352-CCA-R3CD, 2006 WL 3431923, at *2 (Tenn. Crim. App. Nov. 29, 2006); *see also Shadoan*, 340 F.3d at 407-08 (applying § 55-4-110 to temporary tag). Given that Simpson has failed to present any compelling reason why such an interpretation is in error, we need consider this argument no further.

In yet another interpretive twist on the statute, Simpson further argues that section 110 does not specifically require that the *expiration date* of the tag be legible. He contends that the requirement that the license plate be "clearly legible" means only the actual tag number, and not the expiration date. But such an interpretation makes no sense in the context of a Tennessee temporary license plate, because the only information of any consequence listed on such a plate *is* the expiration date. A Tennessee temporary tag includes a large, prominently displayed expiration date in the center of the plate, the words "Tennessee Department of Safety" across the top, and a much smaller section at the bottom which includes the vehicle identification number and other information, but no "registration number" per se. J.A. 76-77, 304-06. Thus, Simpson's proposed interpretation would exempt from visibility and legibility requirements the very information that Tennessee has deemed most important on its temporary tags. We think it highly unlikely that the Tennessee courts would interpret section 110 in such a manner, and we decline to do so.[12]

---

*Moran*, 503 F.3d 1135, 1141 (10th Cir. 2007); *United States v. Grigg*, 498 F.3d 1070, 1081 (9th Cir. 2007).

[11] Resolving whether *Freeman* controls in the context of a *civil* traffic infraction, as *Gaddis* seems to assume (even though *Freeman* did not involve a civil infraction), is not necessary to the disposition of this case.

[12] It is true that the law governing the design of license plates in Tennessee exempts the "year number" from the requirement that the characters be "of sufficient size to be readable from a distance of one hundred feet (100') during daylight." T.C.A. § 55-4-103(c). When examining the statutory context, however, it is clear that this exemption from legibility requirements applies only to the annual expiration date found on *permanent* license plates. The neighboring provisions indicate that the registration plates to which section 103(c) refers are those that have "individual distinctive alpha-numerical characters not to exceed a combination of six," *id.* § 55-4-103(b)(1), "the name of the county of issue," *id.* § 55-4-103(b)(4), and "the words 'Volunteer State,'" *ibid.*—all features that appear on permanent (but not temporary)

Having dispensed with Simpson's creative statutory interpretations, we examine whether Officer Ratcliff had reasonable suspicion that § 55-4-110(b) was being violated. In this case, the officer testified that he could not discern the expiration date of the tag even when traveling a single car length behind Simpson's vehicle with his headlights shining directly on it. He could only make out the expiration date once he had stopped the car, gotten out, and shined his flashlight directly on the plate from a distance of only a few feet. Although we are aware of no Tennessee case law that indicates a precise distance from which a temporary tag's expiration date must be visible, it seems reasonable to assume that more than a few feet is required. Regardless, the proper question is not whether Simpson was, in fact, violating § 55-4-110(b) by having an illegible expiration date on his temporary tag. The question is whether Officer Ratcliff had an objectively reasonable suspicion that a violation of that statute was occurring. Thus, even if the minimal legibility of the expiration date from a few feet away were enough to pass muster with section 110, the inability of the officer to perceive the expiration date while driving at very close proximity gave him at least reasonable suspicion to believe that the statute was being violated. Additionally, the deteriorated condition of the temporary tag added to the officer's suspicion that it violated Tennessee law. A tag that is "very weathered," "faded," "torn," "flapping," and "coming apart," is surely less legible than one that is in good condition.[13] Under these circumstances, a temporary investigative stop was reasonable under the Fourth Amendment. Once Officer Ratcliff approached the vehicle to explain the reason for the stop—something that is surely permissible even if the officer, after executing the stop, had concluded that there was no violation of law—he immediately developed further reasonable suspicion (the odor of marijuana) to detain the vehicle. The canine alert provided probable cause, *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994), and the suppression motion was properly denied.

We reject Simpson's contention that our holding in this case will give officers *carte blanche* to pull over any vehicle bearing a temporary license plate. In support of this argument, he cites *United States v. Wilson*, 205 F.3d 720 (4th Cir. 2000) (en banc), where the Fourth Circuit unanimously held that the inability of a police officer to perceive the expiration date on a temporary tag at night—where there was no other allegation of improper display—did not give rise to reasonable suspicion that the law was being violated.

In *Wilson*, a South Carolina police officer spotted a car bearing a North Carolina temporary tag.

> The officer followed behind the [car] for a quarter to half of a mile, but he was unable to read the expiration date on the tag. The officer admitted that he never saw anything illegal about the tag or the operation of the car. There was no evidence that the tag was concealed, improperly displayed, smudged, or faded by age. Solely because he could not read the handwritten expiration date "in the bottom little corner of the paper tag," [the officer] signaled for the driver of the [car] to pull over.

*Id.* at 722. The court went on to grant the defendant's motion to suppress, stating that "[a]lthough [the officer] 'could not see the written-in expiration date on the tag,' that appears to have been a function of the darkness and the small space provided for writing in the date." *Id.* at 723. Absent any evidence that the tag "was illegible or in any way obliterated, smudged, or faded," or otherwise violated the law, the court felt "compel[led to] conclu[de] that the officer lacked any articulable, reasonable suspicion that a violation had occurred." *Id.* at 723-24.

---

license plates in Tennessee.

[13] The officer may also have suspected, given the tag's poor condition and lack of a legible expiration date, that the tag was so old that it had, in fact, expired. While an investigatory stop to confirm the date of expiration may have been justified, since the officer never specifically cited it as a reason for the stop, we do not—unlike the magistrate judge—rest our conclusion on this basis.

While we certainly agree with our sister circuit that "[t]he Fourth Amendment does not allow a policeman to stop a car just because it has temporary tags," *id.* at 724, we believe that this case is distinguishable from *Wilson* for at least two reasons: (1) the officer in *Wilson* stated that "he never saw anything illegal about the tag" whereas in this case, Officer Ratcliff has steadfastly maintained that the illegibility of the expiration date was a violation of Tennessee law; and (2) unlike the tag in *Wilson*, the tag in this case was faded and deteriorating, precisely the circumstances that the *Wilson* court recognized might have changed the outcome in that case. *See id.* at 723. In other words, in *Wilson*, other than the small print size of the expiration date, there was no objective basis to suspect any violation of law. In this case, there were other indicia that Simpson's temporary license plate violated Tennessee law besides the illegibility of its expiration date; specifically, the faded, weathered, torn, and otherwise deteriorated state of the tag. Indeed, the condition of the tag was so recognizably poor that Simpson himself, upon being stopped, asked the officer whether it had fallen off.[14]

### D. District Court's Interpretation of T.C.A. § 55-4-110(b)

Finally, though we affirm the judgment of the district court, we reject its overbroad interpretation of § 55-4-110(b). Specifically, the court stated that, under Tennessee law,

> *any* invisibility or obstruction to visibility of *any portion* of the tag could constitute a violation of the statute, even if such invisibility or obstruction to visibility is temporary—or even momentary—and may be easily cured, as by the turning on of headlights or by a slight change in distance or the position of the vehicle in relation to the observer.

*Simpson*, 2006 WL 3198945, at *4. Taken literally, this would mean that a license plate frame that covers no relevant plate information violates § 55-4-110(b). It also would mean that a police officer who had difficulty seeing a license plate at some unspecified distance or position, even if the license plate were visible at a closer distance or different position, could nevertheless stop a vehicle. The Tennessee Court of Criminal Appeals has recently rejected such an overly broad interpretation of § 55-4-110(b). *See State v. Hall*, No. E2006-01915-CCA-R3-CD, 2007 WL 2917728, at *4 (Tenn. Crim. App. Oct. 5, 2007) (holding that an officer's "subjective judgment that [a] license plate [that was affixed to a ladder on the back of a van] was 'hard to see' [without the use of the headlights on his patrol car] cannot be construed as a 'particularized and objective basis' for suspecting that the defendant was in violation of [§ 55-4-110(b)]," at least where the license plate was otherwise properly displayed). Cases involving application of state law are to be analyzed on an individual basis, always with careful consideration of any applicable state court precedent, and not subject to the kind of sweeping generality stated by the district court here.[15]

### III. Conclusion

Viewing the facts "in the light most likely to support the district court's decision," *Navarro-Camacho*, 186 F.3d at 705 (internal quotation omitted), we accept the lower court's determination

---

[14] The district court's reliance on *Dycus*, 151 F. App'x 457 (6th Cir. 2005), to overcome *Wilson* was misplaced. *Dycus* involved a Tennessee motorist who was driving after dark with an unilluminated license plate, a clear violation of § 55-4-110(b). The *Dycus* court thus held that the officer had probable cause. The case did not speak to whether an illegible expiration date on a temporary tag could justify a traffic stop, the issue that both *Wilson* and this case address.

[15] Although the district court cited an unpublished Tennessee Court of Criminal Appeals case in ostensible support of its broad interpretation of T.C.A. § 55-4-110(b), *see Simpson*, 2006 WL 3198945, at *4 (citing *State v. Matthews*, No. M200100754CCAR3CD, 2002 WL 31014842 (Tenn. Crim. App. Sept. 10, 2002)), that case interpreted the statute in a very limited context, holding only that § 55-4-110 requires that license plates be "clearly visible at all times," *Matthews*, at *3, with no discussion of distance or viewpoint.

that Officer Ratcliff testified credibly.  That testimony establishes that the officer had at least a reasonable suspicion that Simpson was in ongoing violation of a misdemeanor traffic offense, thereby justifying an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968).  Once he had stopped the vehicle, the officer immediately developed reasonable suspicion of the presence of drugs, permitting additional detention, and developed probable cause to search the vehicle upon the alert of a trained narcotics-detection dog.  For these reasons, we AFFIRM the judgment of the district court.