NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0394n.06

No. 14-6245

FILED
Jun 01, 2015
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| FRANCISCO VALTIERRA ZUNIGA, | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | **OPINION** |
| | ) | |

**BEFORE: MOORE, SUTTON, and WHITE, Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.** A grand jury charged Defendant Francisco Valtierra Zuniga and fifteen co-conspirators with conspiracy to possess and distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. § 846. Zuniga was tied to the conspiracy through evidence seized during a traffic stop in which a large amount of cash that Zuniga was in the process of delivering to a drug supplier in Texas was found hidden in the truck he was driving. Zuniga unsuccessfully moved to suppress that evidence before the district court. Zuniga appeals the denial of that motion here, arguing that the suppression hearing testimony from the trooper who initiated the traffic stop is not credible and, thus, there was no probable cause for the initial traffic stop, the trooper unreasonably extended the traffic stop, and Zuniga did not consent to a search of the truck. We disagree, and for the following reasons, **AFFIRM** the district court's denial of Zuniga's motion to suppress.

## I. BACKGROUND

In early 2013, an FBI task force began investigating individuals involved in a drug trafficking conspiracy in Memphis, Tennessee. Around July 2 of that year, federal agents intercepted phone calls through a wire-tap indicating that a member of the conspiracy, Osiel Lopez-Acuna, had recently received eight kilograms of cocaine from a supplier in Texas, R. 346 (Suppression Hr'g at 12) (Page ID #786), and officers began conducting surveillance on Lopez-Acuna at a home located at 1044 Sandra Road in Memphis, *id*. at 13 (Page ID #787). Pursuant to the investigation, the FBI determined that Lopez-Acuna was planning to use a white Ford F-250 pickup truck that was parked in the backyard of 1044 Sandra Road as a load vehicle to transport money back to the cocaine supplier in Texas. *Id*. at 13–14 (Page ID #787–88). The officers intercepted a number of calls indicating that Lopez-Acuna and his crew were in the process of packing the truck for the delivery to Texas. *Id*. at 15 (Page ID #789).

Based on this information, a member of the FBI task force, Officer Jason Bartlett, contacted Arkansas State Police Trooper Trenton Behnke about assisting the task force by pulling the truck over if it entered Arkansas. *Id*. at 28 (Page ID #802). Bartlett told Behnke that, pursuant to communications intercepted through a wire-tap, they believed the vehicle would be traveling from Memphis to Texas and would likely be carrying either money or narcotics. *Id*. at 45 (Page ID #819). Bartlett instructed Behnke to develop his own probable cause for the traffic stop because the FBI did not want to compromise the investigation. *Id*. at 18 (Page ID #792). Bartlett had relied on Behnke on two or three prior occasions to develop probable cause for a

traffic stop, and Behnke had been successful in finding probable cause for a stop in each of those instances. *Id*. at 30–31 (Page ID #804–05).

At 3:00 A.M. on July 2, agents observed the white truck leave the Sandra Road residence. *Id*. at 16 (Page ID #790). Defendant Zuniga was the driver and there were no passengers in the truck. Two FBI vehicles followed the truck, with Bartlett in the secondary vehicle about a quarter of a mile behind the truck. *Id*. at 32 (Page ID #806). As the truck approached Arkansas, Bartlett called Behnke and gave him a description of the truck and its license plate number. *Id*. at 46 (Page ID #820). Behnke told Bartlett that he would wait for the white truck at mile-marker 183 on Interstate-40, near Forrest City, Arkansas. *Id*. at 17 (Page ID #791). Behnke was driving a marked patrol unit and had a certified narcotics dog named Major with him as he waited for the white truck to pass mile-marker 183. *Id*. at 42 (Page ID #816).

At the suppression hearing, Behnke testified that he observed the white truck pass his patrol car between 4:55 A.M. and 5:00 A.M. *Id*. at 79 (Page ID #853). He testified that as the vehicle passed, the truck occupied two lanes at once, with half the vehicle in one lane and half in another, in violation of Arkansas law. *Id*. at 48–49 (Page ID #822–23). Behnke immediately pulled behind the truck to verify that the license plate number matched the one Bartlett had provided. *Id*. Behnke testified that he then observed the truck drive outside the fog line, again, in violation of Arkansas law. *Id*. At this time, Behnke activated his flashing blue lights to pull the truck over; however, Zuniga drove at least a half of a mile before pulling over, which surprised Behnke because there was very little traffic and he believed there was no reason Zuniga could not have pulled over sooner. *Id*. at 49 (Page ID #823). Bartlett did not see either

of the traffic violations because he remained a quarter of a mile behind the truck at the time of the traffic stop. *Id*. at 33 (Page ID #807).

Behnke testified that the traffic stop was warranted because Zuniga committed two traffic violations—improper or unsafe lane change and improper or unsafe lane usage. *Id*. at 49 (Page ID #823). When asked at the suppression hearing if he remembered the statutory section governing these violations, Behnke "believed" these violations are set forth in Arkansas Code § 27-51-304, *id*; however, this section addresses vehicles driving on one way roads and traffic islands. *See* Ark. Code § 27-51-304.

After pulling the truck over, Behnke walked along the passenger side of the truck and noticed an external fuel tank, a generator, a ladder, and a toolbox that was bolted to the truck bed. *Id*. at 49–50 (Page ID #823–24). Zuniga rolled down the passenger window, and Behnke informed him of the traffic violations and asked for Zuniga's driver's license and proof of insurance. *Id*. at 51 (Page ID #825). Zuniga handed Behnke his proof of insurance, but not his license. *Id*. Behnke testified that when Zuniga handed over his insurance "his hand was shaking so bad I thought he was going to drop his insurance [card]," which Behnke thought was "odd." *Id*. When Behnke asked for Zuniga's driver's license again, Zuniga handed him a Mexican driver's license with the name Fabian Avila Prieto on the license. *Id*. at 22, 51–52 (Page ID #796, 825–26). Behnke then asked Zuniga if he was in the country illegally, and Zuniga responded that he was. *Id*. at 52 (Page ID #826).

Behnke asked Zuniga to exit the vehicle. *Id*. at 52–53 (Page ID #826–27). After doing so, Zuniga immediately put his hands behind his back and turned around in an arrest position.

4

*Id*. at 53 (Page ID #827). Behnke told Zuniga to turn around so they could continue to talk. *Id*. Behnke asked Zuniga where he was coming from, and Zuniga first responded that he was coming from Arkansas, but then corrected and stated that he came from Memphis and was driving to see his family for the Fourth of July. *Id*. at 53–54 (Page ID #827–28). Based on his conversations with Bartlett, Behnke knew Zuniga had lied when he initially stated he was coming from Arkansas. *Id*. at 54 (Page ID #828). Behnke then asked Zuniga about his occupation, and Zuniga explained that he did sheetrock work. *Id*. But Behnke testified that the tools in the bed of Zuniga's truck were not consistent with sheetrock work, and Zuniga's hands appeared smooth and uncalloused, which was inconsistent with the hands of sheetrockers Behnke had encountered. *Id*. at 54–55 (Page ID #828–29). Behnke also noticed that Zuniga's insurance card indicated that it had been issued two days earlier in Dallas, Texas, which made Behnke suspicious because this meant Zuniga was heading back to Texas just two days after leaving. *Id*. at 95 (Page ID #869).

At this point, Behnke asked Zuniga whether he had any large sums of money, drugs, or dead bodies in the truck; Zuniga glanced at the back of the truck and said "no." *Id*. at 55 (Page ID #829). Behnke then asked Zuniga for consent to search the truck, and Zuniga said "yes." *Id*. Behnke asked Zuniga if he understood what Behnke was saying and Zuniga again said "yes." *Id*. at 55–56 (Page ID #829–30). Behnke testified that he recalled Zuniga stating at some point during the traffic stop that his English was not good, but that Zuniga appeared to understand their conversations and never said he did not understand any of Behnke's questions. *Id*. Based on his

observations and Zuniga's responses to questioning, Behnke believed that Zuniga could speak and understand English. *Id*. at 56 (Page ID #830).

Behnke then retrieved Major from his patrol car and began walking the dog around the truck for a drug detection test. *Id*. As they circled the truck, Major exhibited a "profound alert"—which is a sudden change in behavior that Behnke was trained to detect—around the gas tank of the truck and then attempted to jump into the truck bed; according to Behnke, this was "very unusual behavior" for Major. *Id*. at 56–57 (Page ID #930–31). Because of Major's alert, Behnke began searching the L-shaped exterior fuel tank in the bed of the truck, which in Behnke's experience is an "area[] of high concealment." *Id*. at 58 (Page ID #832). After removing a toolbox from the top of the fuel tank, Behnke used a "density meter" to measure the density of the external fuel tank. *Id*. at 59 (Page ID #833). Behnke looked inside the fuel tank and saw about an inch of fuel, but when he ran the density meter around the center of the tank the meter indicated very high density in that area, much higher than other parts of the tank. *Id*. at 59–60 (Page ID #833–34). Based on Behnke's training and experience, this suggested that there was something around the center of the tank that should not have been there. *Id*. at 60 (Page ID #834). So Behnke drilled a hole through the tank and dropped a fiber optic scope inside, which revealed that something packed in cellophane was attached to the center of the fuel tank. *Id*. at 61 (Page ID #835). Given his phone calls with Bartlett and the direction Zuniga was traveling, Behnke suspected that money was hidden inside the fuel tank. *Id*.

Behnke then placed Zuniga under arrest. The total length of the traffic stop was thirty minutes. *Id*. at 62 (Page ID #836). Following a complete search, police recovered $217,324 in

6

cash, which was wrapped in twenty-two packages of cellophane. *Id*. at 64 (Page ID #838); Appellant Br. at 15. The cash was seized, as was the truck, but after consulting with the FBI, Behnke released Zuniga without charges. R. 346 (Suppression Hr'g at 64) (Page ID #838). A grand jury later charged Zuniga and fifteen co-defendants with conspiracy to possess and to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. § 846. R. 154 (Supersed. Indictment) (Page ID #228).

Zuniga moved to suppress the evidence recovered during the traffic stop on the grounds that the stop and subsequent search were illegal. A magistrate judge denied the motion. Crediting Behnke's testimony, the magistrate judge found that the initial stop was supported by probable cause, the continued detention was based on reasonable suspicion, Zuniga's consent was valid, and the money would have been inevitably discovered in any event. R. 325 (Mag. R&R) (Page ID #718). Zuniga objected to the magistrate judge's report and recommendation, arguing that Behnke's testimony regarding the probable cause for the traffic stop, the continued detention, and Zuniga's consent was not credible. R. 350 (Obj. to R&R) (Page ID #904). Reviewing de novo, the district court adopted the report and recommendation. R. 388 (D. Ct. Op.) (Page ID #1014). Zuniga pleaded guilty to conspiracy to possess and to distribute in excess of five kilograms of cocaine, but preserved his right to appeal the order denying his motion to suppress pursuant to Federal Rule of Criminal Procedure 11(a)(2). R. 426 (Plea Agreement at 3) (Page ID #1088). This appeal followed.

## II. STANDARD OF REVIEW

"When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo, considering the evidence in the light most favorable to the government." *United States v. Richards*, 659 F.3d 527, 536 (6th Cir. 2011). "Whether a seizure was unreasonable is a question of law that we review de novo." *United States v. Noble*, 762 F.3d 509, 519 (6th Cir. 2014). "We also review de novo whether an officer had reasonable suspicion to justify extending a traffic stop, which is a mixed question of law and fact." *United States v. Winters*, 782 F.3d 289, 295 (6th Cir. 2015). With that said, because "the lower courts are at an institutional advantage, having observed the testimony of the witnesses and understanding local conditions . . . due weight should be given to the inferences drawn from the facts by resident judges." *Id*. (internal quotation marks omitted). In the end, "[i]t is the [Government's] burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Id*. (internal quotation marks omitted; brackets in original).

## III. ANALYSIS

On appeal, Zuniga argues that the district court clearly erred by adopting the magistrate judge's determination that Behnke was a credible witness. In particular, Zuniga claims that the district court should have disregarded Behnke's testimony, or, at least, ordered a new evidentiary hearing, regarding whether Behnke had probable cause for the traffic stop, whether Behnke had sufficient grounds to continue his investigation, and whether Zuniga consented to the search.

"The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). But because the purpose of a traffic stop is limited and the detention generally brief, "the usual traffic stop is more analogous to a so-called '*Terry* stop[]' than to a formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (citation omitted); *see Terry v. Ohio,* 392 U.S. 1, 16–19 (1968). "Under this framework, the stop must be 1) 'justified at its inception'; and 2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Winters*, 782 F.3d at 296 (quoting *Terry*, 392 U.S. at 20). Thus, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

The traffic stop here was justified at its inception. Behnke testified that as Zuniga passed his patrol car Zuniga's truck illegally occupied two lanes at once, and then after Behnke drove up behind the truck, he observed Zuniga drive outside of his lane. R. 346 (Suppression Hr'g at 48–49) (Page ID #822). The parties agree that, given the nature of these violations, Behnke needed probable cause to believe that these traffic violations occurred to justify the traffic stop. *See* Appellee Br. at 27 (citing *United States v. Simpson*, 520 F.3d 531, 540–41 (6th Cir. 2008) (a "completed violation" requires probable cause to justify traffic stop)). Zuniga does not claim that these actions are insufficient to establish cause for a traffic stop. *See Whren v. United States*, 517 U.S. 806, 810 (1996) (a seizure is constitutionally "reasonable where the police have probable cause to believe that a traffic violation has occurred"). Instead, he argues that Behnke's

testimony is not credible because the stop was pretextual and because Behnke cited the wrong statutory provision at the suppression hearing. But, as Zuniga concedes, an officer's "subjective intent or hope to uncover unrelated criminal conduct is irrelevant." *United States v. Everett*, 601 F.3d 484, 495 n.12 (6th Cir. 2010) (citing *Whren*, 517 U.S. at 813). So Behnke's pretextual motivation for the traffic stop is immaterial. Similarly, the fact that Behnke cited the wrong statutory provision at the suppression hearing—from memory, he mistakenly believed the governing provision was Arkansas Code § 27-51-304 rather than § 27-51-104 (titled "Careless driving")—is no matter. Behnke's testimony indicates that he had probable cause to pull Zuniga over based on the traffic violations, and Zuniga offered no evidence suggesting otherwise or indicating that the fact-finder's credibility determination was clearly erroneous.

The continued detention of Zuniga for further questioning was also justified. After Zuniga admitted that he was in the country illegally, Behnke ordered Zuniga out of the truck and asked him where he was coming from and going; what kind of work he did; whether the truck contained large sums of money, drugs, or dead bodies; and whether Zuniga would consent to Behnke searching the truck. We have previously explained that an officer may order an individual out of an automobile during a traffic stop and briefly ask questions unrelated to the stop so long as the questions do not "measurably extend" the stop's duration. *United States v. Stepp*, 680 F.3d 651, 661–62 (6th Cir. 2012).[1] Regardless, an officer can extend a stop where

---

[1] In *Stepp*, we recognized a distinction between extending a stop after the reason for the initial stop has concluded, where even de minimis extension is unreasonable, and extending a "not-yet-completed traffic stop," where the reasonableness standard—in which "de minimis extensions" are not unreasonable—governs. *Stepp*, 680 F.3d at 661–62 ("A traffic stop is not

"something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *Winters*, 782 F.3d at 297 (internal quotation marks omitted); *see Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (officer may prolong a stop based on the "the reasonable suspicion ordinarily demanded to justify detaining an individual").

Behnke's additional questions were justified here because he had reasonable suspicion to question Zuniga further. Behnke knew that, based on its investigation, the FBI intercepted a communication through a wire-tap indicating that the white truck driven by Zuniga was traveling from Memphis to Texas to deliver illegally either drugs or money. Then, when Behnke activated his flashing blue lights to pull Zuniga over after the traffic violations, Zuniga drove at least a half of a mile before pulling the truck to the side of the road, despite nothing preventing him from doing so immediately. Zuniga acted very nervously when asked for his insurance card and

---

'measurably' extended by extraneous questioning [before completion of the traffic stop] even when such questioning undeniably prolongs the stop to a minimal degree."). The Supreme Court recently endorsed our approach precluding even de minimis extension after the reason for the stop has concluded, but included language suggesting that this standard may apply regardless of when the questioning occurs. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015) ("[A] traffic stop prolonged beyond [the time reasonably required to complete the stop's mission] is unlawful. The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—*i.e.*, adds time to—'the stop.'" (internal quotation marks and citations omitted)). But we do not need to resolve the impact of *Rodriguez* here because, as set forth below, Behnke had reasonable suspicion to extend the stop and any recent change in the law would not impact this case in any event. *See Winters*, 782 F.3d at 306 ("'[E]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.'" (quoting *Davis v. United States*, 131 S. Ct. 2419, 2429 (2011))).

driver's license,[2] and he told Behnke that he was in the country illegally. Zuniga then initially lied about where he was coming from, but soon admitted that he was traveling from Memphis to Texas, consistent with the FBI's suspicion. Finally, Zuniga's insurance card indicated that it was issued from Dallas, Texas, just two days prior to the traffic stop, which seemed suspicious to Behnke because Zuniga claimed he was traveling to Texas to spend the Fourth of July with his family. *See Stepp*, 680 F.3d at 666 (recognizing that we have "placed weight on implausible travel plans in considering whether reasonable suspicion has arisen"). Together, these reasonably supported the FBI's belief that Zuniga was traveling from Memphis to Texas in furtherance of the drug conspiracy. Behnke thus had reasonable suspicion to extend the stop for further investigation.

Next, Zuniga argues that the consent to search was not valid because he did not understand English. "The question of whether consent to search was freely and voluntarily given 'is a question of fact to be determined from the totality of the circumstances.'" *United States v. Cochrane*, 702 F.3d 334, 342 (6th Cir. 2012) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). Consent is voluntary where it is "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (internal quotation marks omitted). Here, Behnke testified that when he asked Zuniga for consent to search the truck, Zuniga unequivocally responded, "yes." Following up,

---

[2]As we have previously explained, Zuniga's nervousness is not a strong indicator of criminal activity. *Stepp*, 680 F.3d at 665. Moreover, contrary to the district court's finding, the fact that Zuniga did not have sheetrock tools in his truck and his hands were in Behnke's estimation too smooth for a sheetrocker does not support a finding of reasonable suspicion that justifies further detention.

Behnke asked Zuniga if he understood what Behnke was asking him, and Zuniga again answered "yes." Indeed, although Zuniga told Behnke at some point that his English was not very good, Behnke testified that Zuniga understood their conversation and responded in English to his questions—including questions asking Zuniga for his insurance and driver's license, where he was coming from and going, and the type of work that he did—and nothing in the record suggests that Zuniga was deceived or coerced into giving consent. Further, Zuniga offered no evidence at the suppression hearing contesting this evidence or suggesting that Zuniga did not fully understand Behnke's questions. Thus, the district court did not clearly err by crediting Behnke's testimony that Zuniga understood English when he consented to the search. *See United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996) (consent valid where the defendant "had no difficulty responding in English to questions posed at the scene of the arrest and did not indicate that he did not understand the detective's inquiries"), *abrogated on other grounds by Muscarello v. United States*, 524 U.S. 125 (1998); *United States v. Valdez*, 147 F. App'x 591, 596 (6th Cir. 2005) (upholding consent search where defendant could "understand, and interact with" law enforcement, including complying with requests to produce his license and responding to questions about his travel plans in English).

In any event, even without valid consent the reasonable suspicion noted above provided sufficient justification for the subsequent dog sniff, which alerted Behnke that criminal activity was afoot. *See Stepp*, 680 F.3d at 666–67 (holding "the recitation of vague travel plans" and prior criminal history provided reasonable suspicion for further questioning and dog sniff). "It is clear that 'an alert by a properly trained and reliable drug-detection dog is sufficient to establish

13

probable cause for the presence of a controlled substance.'" *Winters*, 782 F.3d at 304 (internal quotation marks and brackets omitted). "[S]uch probable cause extends to every part of the vehicle and all containers found therein in which the object of the search could be hidden." *Id.* (internal quotation marks omitted). Here, Behnke testified that the dog was properly certified, and Zuniga did not contest the dog's qualifications before the district court or on appeal. Thus, based on the alert given by the drug dog, Behnke had probable cause to search the truck by using the density meter to test the external fuel tank, which led to discovery of the hidden compartment containing $217,324 in drug proceeds. As a result, the evidence obtained through the traffic stop and subsequent search was properly seized.[3]

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of Zuniga's motion to suppress.

---

[3]Zuniga raises other issues that he claims indicate that Behnke's testimony is not credible, but on examination we need not address these issues because they do not impact our analysis.